# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JILL STRELZIN, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:22-cv-05644 |
| vs. | ) ) | (Circuit Court of Cook County, Illinois, County Department – Chancery Division, Case |
| ZILLOW GROUP, INC., | ) ) | No. 2022CH09132) |
| Defendant. | ) ) ) | |

## NOTICE OF REMOVAL

**PLEASE TAKE NOTICE** that Defendant Zillow Group, Inc. ("Zillow"), by and through its undersigned counsel, hereby files this Notice of Removal pursuant to 28 U.S.C. §§ 1441 and 1446, removing this action from the Circuit Court of Cook County, Illinois County Department – Chancery Division, Case No. 2022CH09132, in which it is now pending, to the United States District Court for the Northern District of Illinois, on the grounds that there is jurisdiction in this Court pursuant to 28 U.S.C. § 1332(a). In support of this Notice of Removal, Zillow respectfully states the following:

1. On September 15, 2022, Jill Strelzin ("Plaintiff") filed a Putative Class Action Complaint against Zillow in the Circuit Court of Cook County, Illinois County Department – Chancery Division, Case No. 2022CH09132 (the "State Court Action"). In compliance with 28 U.S.C. § 1446(a), a true and correct copy of the Complaint in the State Court Action is attached as Exhibit A.

2. On September 15, 2022, Zillow was served with original process.

3.      Pursuant to 28 U.S.C. § 1446(d), written notice of the removal of this action shall be promptly served upon Plaintiff and Notice of Filing with the Clerk for the Circuit Court of Cook County.  A true and correct copy of the proposed Notice of Filing of Notice of Removal is attached as Exhibit B.

## JURISDICTION

4.      This Court has original jurisdiction, and this action is properly removable, pursuant to the Class Action Fairness Act of 2005 ("CAFA").  *See* 28 U.S.C. §§ 1332, 1446, and 1453.  The amount in controversy exceeds $5 million.  There are more than 100 putative class members.  The members of the putative class are citizens of the State of Illinois.  Defendant is a Washington citizen.

5.      CAFA defines a class action as "any civil action filed under [R]ule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by one or more representative persons as a class action."  *See* 28 U.S.C. §§ 1332(d)(1)(B), 1453(a).  The Complaint falls within this definition because Plaintiff brings this action pursuant to 735 ILCS 5/2-801, individually and on behalf of a putative class.  (Compl. at ¶ 57).

6.      While Plaintiff does not make any allegations about the size of her proposed class, two complaints filed in this Court, asserting substantially similar claims likewise on behalf of an Illinois class, assert that the putative classes in those cases contain more than 100 individuals.  Attached hereto as Exhibit C is a true and correct copy of the complaint in *Ryan Margulis v. Zillow Group, Inc.*, Case 1:22-cv-04847 (N.D. Ill.) (*see* ¶ 7); attached hereto as Exhibit D is a true and correct copy of the complaint in *Mark Conlisk and Michael Dekhtyar v. Zillow Group, Inc.*, Case 1:22-cv-05082 (N.D. Ill.) (*see* ¶ 9).  Moreover, as of August 4, 2022, Zillow has 234 million

average monthly unique users.  Zillow Group, Inc., Current Report (Form 8-K - Ex-99.3) (Aug. 4, 2022).  And, as of July 1, 2021, Illinois had a population of 12,671,469.  *See* https://www.census.gov/quickfacts/fact/table/IL (last visited October 4, 2022).  It is therefore plausible that a minimum of 100 individuals, from Zillow's 234 million monthly unique users, were located in Illinois.

7.      CAFA defines diversity citizenship as "any member of a class of Plaintiffs [who] is a citizen of a State different from any Defendant."  *See* 28 U.S.C. §§ 1332(d)(2)(A).  This requirement is satisfied here.  Plaintiff is a citizen of Illinois.  *See* Compl. at ¶ 5.  As further alleged in the Complaint, Zillow is both headquartered in and organized under the laws of Washington. *Id.* at ¶ 6.  For diversity purposes, a corporation is deemed a citizen of the states in which it is incorporated and where it has its principal place of business, which is defined as its "nerve center." *See* 28 U.S.C. § 1332(c)(1); *Hertz Corp. v. Friend*, 559 U.S. 77, 93 (2010) ("A corporation's 'nerve center,' usually its main headquarters, is a single place.").  Therefore, Zillow is a citizen of Washington.  Because Plaintiff is a citizen of Illinois and Zillow is a citizen of Washington, there is complete diversity of citizenship among the parties, and federal diversity exists under 28 U.S.C. § 1332(a).  Moreover, there has been complete diversity of citizenship at all relevant times.  *See Kanzelberger v. Kanzelberger*, 782 F.2d 774, 776 (7th Cir. 1986).

8.      The claims of individual class members can be aggregated to determine if the amount in controversy exceeds the required "sum or value of $5,000,000, exclusive of interest and costs."  28 U.S.C. §§ 1332(d)(2), (d)(6).  Here, the amount in controversy exceeds $5 million.[1]

---

[1]      Zillow denies Plaintiff's substantive allegations, the appropriateness of class treatment, that Plaintiff is entitled to any of the relief she seeks in her Complaint, and does not waive any defense with respect to any of Plaintiff's claims.  Nonetheless, the amount in controversy is properly determined by accepting Plaintiff's allegations as true.  *See Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 448 (7th Cir. 2005).

*See* 720 ILCS 5/14-16 (permitting recovery of actual damages and punitive damages); 815 ILCS 505/10a(c) (giving express authority to award "reasonable attorney's fees and costs" to prevailing plaintiffs for violations of Illinois' Consumer Fraud and Deceptive Business Practices Act); *Straits Fin. LLC v. Ten Sleep Cattle Co.*, 900 F.3d 359, 373 (7th Cir. 2018) ("allow[ing] fee awards for work on an ICFA claim and for work on non-Act claims when the Act claim is so inextricably intertwined with the non-Act claims that it cannot be distinguished.") (citation omitted); Ex. C at ¶ 7; Ex. D at ¶ 9.

9.      Plaintiff's putative Class Action Complaint alleges three causes of action against Zillow: (i) a putative class claim for violation of Illinois' Eavesdropping Act, 720 ILCS 5/14-1 *et seq.*; (ii) a putative class claim for violation of Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*; and (iii) a putative class claim for the tort of common law invasion of privacy/intrusion upon seclusion.  All three claims arise from Plaintiff's and putative class members' use of Zillow's website.

10.      Plaintiff seeks to recover actual damages, punitive damages, and attorneys' fees. She also seeks an injunction, restitution, and disgorgement, as well as interest.  Compl. at ¶¶ 83, 99 and Prayer for Relief, ¶¶ F-G.

11.      "[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014).  During the three months ended June 30, 2022, Zillow generated total gross profits of $443 million.  *See* Zillow Group, Inc., Quarterly Report (Form 10-Q) (Aug. 4, 2022).  In light of Plaintiff's request for "disgorgement of profits unlawfully obtained," it is plausible that Plaintiff's claims could surpass $5 million.

12.     The Action does not fall within any of exclusion to removal jurisdiction recognized by 28 U.S.C. § 1332(d), and the Plaintiffs have the burden of proving otherwise.

13.     Zillow submits this Notice of Removal without waiving any defenses to the claims Plaintiff asserts, without conceding the Plaintiff has pleaded claims upon which relief can be granted, and without admitting that Plaintiff is entitled to any monetary or equitable relief whatsoever (or that the damages Plaintiff seeks may be properly sought).

### CONCLUSION

**WHEREFORE**, Defendant Zillow Group, Inc, removes this civil action from the Circuit Court of Cook County to the United States District Court for the Northern District of Illinois.

Respectfully submitted,

Dated: October 14, 2022

**BUCHANAN INGERSOLL & ROONEY PC**

By: */s/ David T. Cellitti*
David T. Cellitti (Bar No. 6272041)
401 E. Jackson Street, Suite 2400
Tampa, FL 33602
T: 813-222-8180
david.cellitti@bipc.com

Samantha L. Southall (*Pro Hac Vice* forthcoming)
50 S. 16th Street, Suite 3200
Philadelphia, PA  19102
T: 215-665-8700 | F: 215-665-8760
samantha.southall@bipc.com

*Counsel for Defendant Zillow Group, Inc.*

## **CERTIFICATE OF SERVICE**

I, David T. Cellitti, hereby certify that I caused a copy of the foregoing Notice of Removal

to be served by e-mail on counsel for Plaintiff on October 14, 2022:

Katrina Carroll, Esquire
Kyle Shamberg, Esquire
LYNCH CARPENTER LLP
111 W. Washington Street, Suite 1240
Chicago, IL 60602
T: 312-750-1265 | F: 773-598-5609
katrina@lcllp.com
kyle@lcllp.com

Gary Lynch, Esquire
LYNCH CARPENTER LLP
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
T: 412-332-9243 | F: 412-231-0246
gary@lcllp.com

*Counsel for Plaintiff and the Putative Class*

*/s/ David T. Cellitti*
David T. Cellitti
Dated: October 14, 2022            *Counsel for Defendant Zillow Group, Inc.*

# Exhibit A

Hearing Date: 1/13/2023 9:30 AM
Location: Court Room 2301
Judge: Quish, Clare J

FILED
9/15/2022 11:05 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2022CH09132
Calendar, 14
19503961

FILED DATE: 9/15/2022 11:05 AM   2022CH09132

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT – CHANCERY DIVISION

JILL STRELZIN, individually and on behalf
of all others similarly situated,

      Plaintiff,

v.

ZILLOW GROUP, INC.,

      Defendant.

Case No. _____

**2022CH09132**

### CLASS ACTION COMPLAINT

Plaintiff Jill Strelzin ("Plaintiff"), individually and on behalf of all others similarly situated,

hereby files this class action complaint against Defendant Zillow Group, Inc. ("Defendant" or

"Zillow"), and in support thereof alleges the following:

### INTRODUCTION

1.     This is a class action brought against Zillow for surreptitiously intercepting the

private electronic communications of visitors to its website, www.zillow.com, without their

consent. Zillow knowingly directs third-party vendors, such as Microsoft Corporation, to embed

snippets of JavaScript computer code ("Session Replay Code") on Zillow's website, which then

deploys on each website visitor's internet browser for the purpose intercepting and recording the

website visitor's private electronic communications with the Zillow website, including their mouse

movements, clicks, keystrokes (such as text being entered into an information field or text box),

URLs of web pages visited, and/or other electronic communications in real-time ("Website

Communications"). These third-party vendors (collectively, "Session Replay Providers") create

and deploy the Session Replay Code at Zillow's request.

2. After intercepting and recording the Website Communications, Zillow and the Session Replay Providers use those Website Communications to recreate website visitors' entire visit to www.zillow.com. The Session Replay Providers create a video replay of the user's behavior on the website and provide it to Zillow for analysis. Zillow's directive to the Session Replay Providers to secretly deploy the Session Replay Code results in the electronic equivalent of "looking over the shoulder" of each visitor to the Zillow website for the entire duration of their website interaction.

3. Zillow's conduct violates the Illinois Eavesdropping Act, 720 ILCS 5/14-1, *et seq.*, the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*, and constitutes an invasion of the privacy rights of website visitors.

4. Plaintiff brings this action individually and on behalf of a class of all Illinois citizens whose Website Communications were intercepted at Zillow's direction and use of Session Replay Code embedded on the webpages of www.zillow.com and seeks all civil remedies provided under the causes of action, including but not limited to compensatory, statutory, and/or punitive damages, and attorneys' fees and costs.

## PARTIES

5. Plaintiff is a citizen of the state of Illinois, and at all times relevant to this action, resided and was domiciled in Cook County, Illinois. Plaintiff is a citizen of Illinois.

6. Defendant Zillow Group, Inc. is corporation organized under the laws of Washington, and its principal place of business is located at 1301 Second Ave., Floor 31, Seattle Washington, 98101. Defendant is a citizen of Washington.

FILED DATE: 9/15/2022 11:05 AM 2022CH09132

FILED DATE: 9/15/2022 11:05 AM   2022CH09132

## JURISDICTION AND VENUE

7.     No federal question is presented by this complaint. Plaintiff brings this complaint solely under state law and not under federal law, and specifically not under the United States Constitution, nor any of its amendments, nor under 42 U.S.C. § 1981 or 1982, nor any other federal statute, law, rule, or regulation. Plaintiff believes and alleges that a cause of action exists under state law for the conduct complained of herein.

8.     This Court has personal jurisdiction over Defendant because a substantial part of the events and conduct giving rise to Plaintiff's claims occurred in Illinois. The privacy violations complained of herein resulted from Defendant's purposeful and tortious acts directed towards citizens of Illinois while they were located within Illinois. At all relevant times, Defendant knew that its practices would directly result in collection of information from Illinois citizens while those citizens browse www.zillow.com. Defendant chose to avail itself of the business opportunities of making its real property and rental advertising services specifically available in Illinois (and specifically with respect to Illinois properties) and collecting real-time data from website visit sessions initiated by Illinoisans while located in Illinois, and the claims alleged herein arise from those activities.

9.     Zillow also knows that many users visit and interact with Zillow's websites while they are physically present in Illinois. Both desktop and mobile versions of Zillow's website allow a user to search for nearby properties by providing the user's "current location," as furnished by the location-determining tools of the device the user is using or by the user's IP address (*i.e.*, without requiring the user to manually input an address). Users' employment of automatic location services in this way means that Zillow is continuously made aware that its website is being visited

3

FILED DATE: 9/15/2022 11:05 AM  2022CH09132

by people located in Illinois, and that such website visitors are being eavesdropped on in violation Illinois statutory and common law.

10.     Pursuant to 735 ILCS 5/1-108, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.  Further, the sole defendant does not reside in Illinois and, accordingly, pursuant to 735 ILCS 5/2-101, this action may be brought in any Illinois county.

## FACTUAL ALLEGATIONS

### A.     Website User and Usage Data Have Immense Economic Value.

11.     The "world's most valuable resource is no longer oil, but data."[1]

12.     Earlier this year, Business News Daily reported that some businesses collect personal data (*i.e.*, gender, web browser cookies, IP addresses, and device IDs), engagement data (*i.e.*, how consumers interact with a business's website, applications, and emails), behavioral data (*i.e.*, customers' purchase histories and product usage information), and attitudinal data (*i.e.*, data on consumer satisfaction) from consumers.[2] This information is valuable to companies because they can use this data to improve customer experiences, refine their marketing strategies, capture data to sell it, and even to secure more sensitive consumer data.[3]

13.     In a consumer-driven world, the ability to capture and use customer data to shape products, solutions, and the buying experience is critically important to a business's success.

---

[1] *The world's most valuable resource is no longer oil, but data*, The Economist (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longeroil-but-data.
[2] Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)*, Business News Daily (Aug. 5, 2022), https://www.businessnewsdaily.com/10625-businesses-collecting-data.html.
[3] *Id.*

Research shows that organizations who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[4]

14. In 2013, the Organization for Economic Cooperation and Development ("OECD") even published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[5] In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[6]

15. OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [i.e. $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination of address, date of birth, social security number, credit record and military is estimated to cost USD 55."[7]

**B. Website Users Have a Reasonable Expectation of Privacy in Their Interactions with Websites.**

16. Consumers are skeptical and are wary about their data being collected. A report released by KPMG shows that "a full 86% of the respondents said they feel a growing concern about data privacy, while 78% expressed fears about the amount of data being collected."[8]

---

[4] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, *Capturing value from your customer data*, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data.

[5] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, NO. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.

[6] *Id.* at 25.

[7] *Id.*

[8] Lance Whitney, *Data privacy is a growing concern for more consumers*, TechRepublic (Aug. 17, 2021), https://www.techrepublic.com/article/data-privacy-is-a-growing-concern-for-more-consumers/.

FILED DATE: 9/15/2022 11:05 AM 2022CH09132

FILED DATE: 9/15/2022 11:05 AM    2022CH09132

17.     Another recent paper also indicates that most website visitors will assume their detailed interactions with a website will only be used by the website and not be shared with a party they know nothing about.[9] As such, website visitors reasonably expect that their interactions with a website should not be released to third parties unless explicitly stated.[10]

18.     Privacy polls and studies show that a majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

19.     A recent study by Consumer Reports shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[11]

20.     Moreover, according to a study by Pew Research Center, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.[12]

21.     Users act consistently with their expectation of privacy. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing

---

[9] *CUJO AI Recent Survey Reveals U.S. Internet Users Expectations and Concerns Towards Privacy and Online Tracking*, CUJO (May 26, 2020), https://www.prnewswire.com/news-releases/cujo-ai-recent-survey-reveals-us-internet-users-expectations-and-concerns-towards-privacy-and-online-tracking-301064970.html.

[10] Frances S. Grodzinsky, Keith W. Miller & Marty J. Wolf, *Session Replay Scripts: A Privacy Analysis*, The Information Society, 38:4, 257, 258 (2022).

[11] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, Consumer Reports (May 11, 2017), https://www.consumerreports.org/consumerreports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.

[12] *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, Pew Research Center, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-Confusedand-feeling-lack-of-control-over-their-personal-information/.

FILED DATE: 9/15/2022 11:05 AM 2022CH09132

companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[13]

**C.      How Session Replay Code Works.**

22.      Session Replay Code, such as that implemented on www.zillow.com, enables website operators to record, save, and replay website visitors' interactions with a given website. The clandestinely deployed code provides online marketers and website designers with insights into the user experience by recording website visitors "as they click, scroll, type or navigate across different web pages."[14]

23.      While Session Replay Code is utilized by websites for some legitimate purposes, it goes well beyond normal website analytics when it comes to collecting the actual contents of communications between website visitors and websites. Unlike other online advertising tools, Session Replay Code allows a website to capture and record nearly every action a website visitor takes while visiting the website, including actions that reveal the visitor's personal or private sensitive data, sometimes even when the visitor does not intend to submit the data to the website operator, or has not finished submitting the data to the website operator.[15] As a result, website visitors "aren't just sharing data with the [web]site they're on . . . but also with an analytics service that may be watching over their shoulder."[16]

---

[13]     Margaret Taylor, *How Apple screwed Facebook*, Wired, (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.
[14]     Erin Gilliam Haije, *[Updated] Are Session Recording Tools a Risk to Internet Privacy?*, Mopinion (Mar. 7, 2018), https://mopinion.com/are-session-recording-tools-a-risk-to-internet-privacy/.
[15]     *Id.*
[16]     Eric Ravenscraft, *Almost Every Website You Visit Records Exactly How Your Mouse Moves*, Medium (Feb. 5, 2020), https://onezero.medium.com/almost-every-website-you-visit-records-exactly-how-your-mouse-moves-4134cb1cc7a0.

FILED DATE: 9/15/2022 11:05 AM   2022CH09132

24.     Session Replay Code works by inserting computer code into the various event handling routines that web browsers use to receive input from users, thus intercepting the occurrence of actions the user takes. When a website delivers Session Replay Code to a user's browser, the browser will follow the code's instructions by sending responses in the form of "event" data to a designated third-party server. Typically, the server receiving the event data is controlled by the third-party entity that wrote the Session Replay Code, rather than the owner of the website where the code is installed.

25.     The types of events captured by Session Replay Code vary by specific product and configuration, but in general are wide-ranging and can encompass virtually every user action, including all mouse movements, clicks, scrolls, zooms, window resizes, keystrokes, text entry, and numerous other forms of a user's navigation and interaction through the website. In order to permit a reconstruction of a user's visit accurately, the Session Replay Code must be capable of capturing these events at hyper-frequent intervals, often just milliseconds apart. Events are typically accumulated and transmitted in blocks periodically throughout the user's website session, rather than after the user's visit to the website is completely finished.

26.     Unless specifically masked through configurations chosen by the website owner, some visible contents of the website may also be transmitted to the Session Replay Provider.

27.     Once the events from a user session have been recorded by a Session Replay Code, a website operator can view a visual reenactment of the user's visit through the Session Replay Provider, usually in the form of a video, meaning "[u]nlike typical analytics services that provide

aggregate statistics, these scripts are intended for the recording and playback of individual browsing sessions."[17]

28.     Because most Session Replay Codes will by default indiscriminately capture the maximum range of user-initiated events and content displayed by the website, researchers have found that a variety of highly sensitive information can be captured in event responses from website visitors, including medical conditions, credit card details, and other personal information displayed or entered on webpages.[18]

29.     Most alarming, Session Replay Code may capture data that the user did not even intentionally transmit to a website during a visit, and then make that data available to website owners when they access the session replay through the Session Replay Provider. For example, if a user writes information into a text form field, but then chooses not to click a "submit" or "enter" button on the website, the Session Replay Code may nevertheless cause the non-submitted text to be sent to the designated event-response-receiving server before the user deletes the text or leaves the page. This information will then be viewable to the website owner when accessing the session replay through the Session Replay Provider.

30.     Session Replay Code does not necessarily anonymize user sessions, either.

31.     First, if a user's entry of personally identifying information is captured in an event response, that data will become known and visible to both the Session Replay Provider and the website owner.

---

[17] Steven Englehardt, *No boundaries: Exfiltration of personal data by session-replay scripts*, Freedom to Tinker (Nov. 15, 2017), https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/.
[18] *Id.*

9

32.     Second, if a website displays user account information to a logged-in user, that content may be captured by Session Replay Code.

33.     Third, some Session Replay Providers explicitly offer website owners cookie functionality that permits linking a session to an identified user, who may be personally identified if the website owner has associated the user with an email address or username.[19]

34.     Session Replay Providers often create "fingerprints" that are unique to a particular user's combination of computer and browser settings, screen configuration, and other detectable information. The resulting fingerprint, which is often unique to a user and rarely changes, are collected across all sites that the Session Replay Provider monitors.

35.     When a user eventually identifies themselves to one of these websites (such as by filling in a form), the provider can then associate the fingerprint with the user identity and can then back-reference all of that user's other web browsing across other websites previously visited, including on websites where the user had intended to remain anonymous—even if the user explicitly indicated that they would like to remain anonymous by enabling private browsing.

36.     In addition to the privacy invasions caused by the diversion of user communications with websites to third-party Session Replay Providers, Session Replay Code also exposes website visitors to identity theft, online scams, and other privacy threats.[20] Indeed, "[t]he more copies of sensitive information that exist, the broader the attack surface, and when data is being collected [

---

[19] Id.; see also FS.identify – Identifying users, FullStory, https://help.fullstory.com/hc/en-us/articles/360020828113, (last visited Sep. 8, 2022).
[20] Juha Sarrinen, Session Replay is a Major Threat to Privacy on the Web, itnews (Nov. 16, 2017), https://www.itnews.com.au/news/session-replay-is-a-major-threat-to-privacy-on-the-web-477720.

FILED DATE: 9/15/2022 11:05 AM   2022CH09132

] it may not be stored properly or have standard protections" increasing "the overall risk that data will someday publicly leak or be breached."[21]

37.    Recognizing the privacy concerns posed by Session Replay Code, in 2019 Apple required app developers to remove or properly disclose the use of analytics code that allow app developers to record how a user interacts with their iPhone apps or face immediate removal from the app store.[22] In announcing this decision, Apple stated: "Protecting user privacy is paramount in the Apple ecosystem. Our App Store Review Guidelines require that apps request explicit user consent and provide a clear visual indication when recording, logging, or otherwise making a record of user activity."[23]

**D.    Zillow Secretly Eavesdrops on its Website Visitors' Electronic Communications.**

38.    Zillow operates the website www.zillow.com. Zillow is the "leading online residential real estate" marketplace in the United States for consumers, connecting them to the information and real estate professionals they need to buy, sell, or rent a home.[24]

39.    Zillow has become "synonymous with residential real estate."[25] www.zillow.com is the most popular real estate website in the United States, with over thirty-six million unique

---

[21] Lily Hay Newman, *Covert 'Replay Sessions' Have Been harvesting Passwords by Mistake*, WIRED (Feb. 26, 2018), https://www.wired.com/story/covert-replay-sessions-harvesting-passwords/.

[22] Zack Whittaker, *Apple Tells App Developers to Disclose or Remove Screen Recording Code*, TechCrunch (Feb. 7, 2019), https://techcrunch.com/2019/02/07/apple-glassbox-apps/.

[23] *Id.*

[24] Zillow Group, Inc., *Form 10-K* (Dec. 31, 2021), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001617640/87bbbf30-39cb-4eb7-acdc-1b51265b9687.pdf ("Zillow 10-K").

[25] *Id.*

FILED DATE: 9/15/2022 11:05 AM    2022CH09132

FILED DATE: 9/15/2022 11:05 AM   2022CH09132

monthly visitors[26] and more than 135 million properties are listed on its website.[27] According to a 2021 Google Trends report, "[t]oday more people search 'Zillow' than 'real estate.'"[28]

40.    However, unbeknownst to the millions of individuals perusing Zillow's real estate listings, Zillow knowingly directs Session Replay Providers to embed various Session Replay Codes on its website to track and analyze website user interactions with www.zillow.com. Because the Session Replay Providers are unknown eavesdroppers to visitors to www.zillow.com, they are not parties to website visitors' Website Communications with Zillow.

41.    One such Session Replay Provider that Zillow procures is Microsoft.

42.    Microsoft is the owner and operator of a Session Replay Code titled Clarity, which provides basic information about website user sessions, interactions, and engagement, and breaks down users by device type, county, and other dimensions.[29]

43.    Zillow knowingly derives a benefit and/or information from the Website Communications intercepted and recorded at its direction. Upon information and belief, Zillow uses the intercepted Website Communications to replay website visitors' interactions with www.zillow.com, improve user interactions with its website, and to provide targeted real estate advertisements to its website visitors.

44.    Zillow's knowing direction and use of Microsoft Clarity's Session Replay Code, direction and use of other Session Replay Codes through various Session Replay Providers, and its knowing derivation of a benefit and/or information from the Website Communications

---

[26] *Most Popular Real Estate Websites in the United States as of October 2021, Based on Unique Monthly Visits*, Statista, https://www.statista.com/statistics/381468/most-popular-real-estate-websites-by-monthly-visits-usa/, (last visited Sep. 8, 2022).
[27] Zillow 10-K, *supra*, note 1.
[28] *Id.*
[29] Jono Alderson, *An Introduction to Microsoft Clarity*, Yoast, https://yoast.com/introduction-microsoft-clarity/#h-what-is-microsoft-clarity, (last visited Sep. 8, 2022).

surreptitiously intercepted and recorded by Session Replay Codes is a violation of Illinois statutory and common law.

**E.     Plaintiff's and Class Members' Experience.**

45.     Plaintiff has visited www.zillow.com on her computer while in Illinois.

46.     While visiting Zillow's website, Plaintiff fell victim to Defendant's unlawful monitoring, recording, and collection of Plaintiff's Website Communications with www.zillow.com.

47.     Unknown to Plaintiff, Zillow directs Session Replay Providers to embed Session Replay Code on its website.

48.     During the website visit, Plaintiff's Website Communications were captured by Session Replay Code and sent to various Session Replay Providers.

49.     For example, when visiting www.zillow.com, if a website user views a certain piece of property for rent or sale, that information is captured by the Session Replay Codes embedded on the website:



*Depicting information sent to one of the Service Replay Providers—Microsoft—through a Service Replay Code—Clarity—after viewing a Studio apartment priced at $1,488 while visiting www.zillow.com.*

13

FILED DATE: 9/15/2022 11:05 AM    2022CH09132

50.     Similarly, when visiting www.zillow.com, if a user enters personal information in a text box to schedule a tour, that information is captured by the Session Replay Codes embedded on the website:



*Depicting information sent to one of the Service Replay Providers—Microsoft—through a Service Replay Code—Clarity—after entering a name (purple text) to a text box to schedule a tour of a property.*

51.     The eavesdropping by the Session Replay Code is ongoing during the visit and they intercept the contents of these communications between Plaintiff and Zillow with instantaneous transmissions to the Session Replay Providers, as illustrated below, in which only 30 milliseconds were required to send a packet of even response data, which would indicate whatever the website user had just done:

14

FILED DATE: 9/15/2022 11:05 AM   2022CH09132



52.     The Session Replay Codes operate in the same manner for all putative Class members.

53.     Like Plaintiff, each Class member visited www.zillow.com with Session Replay Code embedded in it, and those Session Replay Codes intercepted the Class members' Website Communications with www.zillow.com by sending hyper-frequent logs of those communications to Session Replay Providers.

54.     Even if Zillow masks certain elements when it configures the settings of the Session Replay Code embedded on its website, any operational iteration of the Session Replay Code will, by its very nature and purpose, intercept the contents of communications between the website's visitors and the website owner.

55.     For example, even with heightened masking enabled, Session Replay Providers will still learn through the intercepted data exactly which pages a user navigates to, how the user moves

15

FILED DATE: 9/15/2022 11:05 AM    2022CH09132

through the page (such as which areas the user zooms in on or interacted with), and additional substantive information.

56. As a specific example, if a user types a particular address or zip code into Zillow's main search bar and initiates a search, even if the text entered into the search bar is masked, Session Replay Providers will still learn what is entered into the bar as soon as the search result page loads. This is so because the responsive search results will be displayed on the subsequent page, and the responsive content generated by Zillow will repeat the searched information back on the generated page. That information will not be masked even if user-inputted text is fully masked in a text field.

## CLASS ACTION ALLEGATIONS

57. Plaintiff brings this action pursuant to 735 ILCS 5/2-801, individually and on behalf of the following Class:

> All natural persons in the State of Illinois whose Website Communications were captured through the use of Session Replay Code embedded in www.zillow.com.

58. Excluded from the class are Defendant, its parents, subsidiaries, affiliates, officers, and directors, all persons who make a timely election to be excluded from the class, the judge to whom this case is assigned and any immediate family members thereof, and the attorneys who enter their appearance in this action.

59. **Numerosity:** The members of the Class are so numerous that individual joinder of all Class members is impracticable. The precise number of Class members and their identities may be obtained from the books and records of Zillow or the Session Replay Providers.

60. **Commonality:** This action involves questions of law and fact that are common to the Class members. Such common questions include, but are not limited to: (a) whether Defendant employed Session Replay Providers to intercept and record Zillow's website visitors' Website Communications; (b) whether Defendant operated or participated in the operation of an

16

FILED DATE: 9/15/2022 11:05 AM    2022CH09132

eavesdropping device; (c) whether Defendant derives a benefit or information from the illegal use of an eavesdropping device; (d) whether Defendant directed another to use an eavesdropping device illegally on its behalf; (e) whether Session Replay Code is an "eavesdropping device" used to intercept or record private electronic communications; (f) whether Defendant acquired the contents of website users' private electronic communications without their consent; (g) whether Plaintiff and Class members had a reasonable expectation of privacy in their Website communications; (f) whether Defendant violated the Illinois Eavesdropping Act 720 ILCS 5/14-1, *et seq.*; (g) whether Defendant's interception of Plaintiff's and Class members' private electronic communications is an unfair or deceptive act or practice; (h) whether Zillow's conduct violates the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* (i) whether Plaintiff and the Class members are entitled to equitable relief; and (j) whether Plaintiff and the Class members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

61.    **Typicality:** Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the uniform prohibited conduct described above. For instance, Plaintiff and each member of the Class had their electronic communications intercepted in violation of the law and their right to privacy. This uniform injury and the legal theories that underpin recovery make the claims of Plaintiff and the members of the Class typical of one another.

62.    **Adequacy of Representation:** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiff has no interest that is antagonistic to the interests of the Class, and Defendant

17

FILED DATE: 9/15/2022 11:05 AM 2022CH09132

has no defenses unique to any Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor her counsel have any interest adverse to the interests of the other members of the Class.

63.     **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

64.     **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendant intercepted Plaintiff's and Class members' Website Communications, then Plaintiff and each Class member suffered damages by that conduct.

65.     **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria and Class members may be readily identified through Zillow's books and records or the Session Replay Providers' books and records.

**COUNT I**
**Violation of Illinois Eavesdropping Act**
**720 ILCS 5/14-1, *et seq.***

66.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

67. Plaintiff brings this claim individually and on behalf of the Class.

68. The Illinois Eavesdropping Act (the "Act") prohibits (1) using an eavesdropping device in a surreptitious manner to overhear, transmit, or record all or any part of any private conversation; (2) intercepting, recording, or transcribing, in a surreptitious manner, any private electronic communication without consent; (3) manufacturing, assembling, distributing, or possessing any electronic, mechanical, eavesdropping, or other device knowing that or having reason to know that the design of the device renders it primarily useful for the purpose of surreptitious overhearing, transmitting, or recording of private conversations or the intersection; or (4) using or disclosing any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication without the consent of all parties to the private electronic communication. 720 ILCS 5/14-2.

69. Any party to any conversation or private electronic communication upon which eavesdropping was practiced shall be entitled to (1) an injunction to prohibit further eavesdropping; (2) actual damages; and (3) punitive damages. punitive damages; 720 ILCS 5/14-6.

70. "Eavesdropping device" is defined as any "any device capable of being used to hear or record oral conversation or intercept, or transcribe electronic communications whether such conversation or electronic communication is conducted in person, by telephone, or by any other means[.]" 720 ILCS 5/14-1(a).

71. "Eavesdropper" is defined as "any person, including any law enforcement officer and any party to a private conversation, who operates or participates in the operation of any eavesdropping device contrary to the provisions of this Article or who acts as a principal, as defined in this Article." 720 ILCS 5/14-1(b).

FILED DATE: 9/15/2022 11:05 AM 2022CH09132

72.     "Principle" is defined as "any person who: (1) knowingly employs another who illegally uses an eavesdropping device in the course of such employment; or (2) knowingly derives any benefit or information from the illegal use of an eavesdropping device by another; or (3) directs another to use an eavesdropping device illegally on his or her behalf." 720 ILCS 5/14-1(c).

73.     "Private electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or part by a wire, radio, pager, computer, electromagnetic, photo electronic or photo optical system, when the sending or receiving party intends the electronic communication to be private under circumstances reasonably justifying that expectation. A reasonable expectation shall include any expectation recognized by law, including, but not limited to, an expectation derived from a privilege, immunity, or right established by common law, Supreme Court rule, or the Illinois or United States Constitution." ILCS 5/14-1(e).

74.     "Surreptitious" is defined as being "obtained or made by stealth or deception, or executed through secrecy or concealment." 720 ILCS 5/14-1(g).

75.     Zillow is an "Eavesdropper" and "Principal" for purposes of the Act because it operates or participates in the operation of an eavesdropping device, knowingly employs another who illegally uses an eavesdropping device, derives a benefit or information from the illegal use of an eavesdropping device, and directs another to use an eavesdropping device illegally on its behalf.

76.     Session Replay Code like that operated and employed at Zillow's direction is a "eavesdropping device" used to transcribe electronic communications within the meaning of the Act.

20

FILED DATE: 9/15/2022 11:05 AM    2022CH09132

77.     The Session Replay Providers are not a party to the Website Communications—Plaintiff and the Class only knew they were communicating with Zillow, not the Session Replay Providers.

78.     Plaintiff's and Class members' intercepted Website Communications constitute the private electronic communications and private conversations within the meaning of the Act.

79.     Zillow intentionally operated and employed Session Replay Code on its website to spy on, automatically and secretly, and intercept its website visitors' private electronic interactions communications with Zillow in real time.

80.     Plaintiff's and Class members' private electronic communications were intercepted contemporaneously with their transmission.

81.     Plaintiff and Class members had a reasonable expectation of privacy in their Website Communications based on the detailed information the Session Replay Code collected from Plaintiff and Class members.

82.     Plaintiff and Class members did not consent to having their Website Communications surreptitiously intercepted and recorded.

83.     Pursuant to 720 ILCS 5/14-6, Plaintiff and members of the Class are entitled to: (1) an injunction to prohibit further eavesdropping; (2) actual damages; and (3) punitive damages. punitive damages

84.     Zillow's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and Class members any time they visit Defendant's website with Session Replay Code enabled without their consent. Plaintiff and Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

FILED DATE: 9/15/2022 11:05 AM 2022CH09132

## COUNT II
### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act
### 815 ILCS 505/1 *et seq.*

85.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

86.     Plaintiff brings this claim individually and on behalf of the Class.

87.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* ("ICFA") protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

88.     The ICFA prohibits "unfair or deceptive acts or practices," including "misrepresentation or the concealment, suppression or omission of any material fact." 815 ILCS 505/2.

89.     The ICFA applies to Zillow's conduct described herein because it protects consumers in transactions that are intended to result, or which have resulted in the sale of goods or services.

90.     Zillow is a "person" within the meaning of ILCS 505/1(c) because it is a corporation.

91.     Plaintiff and members of the Class are "consumers" within the meaning of 815 ILCS 505/1(e) because they visited www.zillow.com to shop for, purchase, or contract to purchase "merchandise"—real estate—for their own use.

92.     Zillow's advertising, offering for sale, and sale of real estate on www.zillow.com is considered "trade" or "commerce" within the meaning of 815 ILCS 505/1(f).

93.     Zillow violated the ICFA by concealing material facts about www.zillow.com. Specifically, Zillow omitted and concealed that it directed Session Replay Providers to secretly

22

FILED DATE: 9/15/2022 11:05 AM    2022CH09132

monitor, collect, transmit, and discloses its website visitors' Website Communications to the Session Replay Providers using Session Replay Code.

94.    Zillow's direction and employment of the Session Replay Providers and their Session Replay Codes to intercept, collect, and disclose website visitors' Website Communications are material to the transactions on www.zillow.com. Zillow is leading online residential real estate marketplace in the United States and Zillow does not disclose its use of Session Replay Code to secretly monitor and collect website visitors' Website Communications. Had Plaintiff and the Class members known that the Session Replay Codes (that collect, transmit, and disclose Website Communications to the Session Replay Providers) were embedded in Zillow's website, they would not have visited www.zillow.com to shop for, purchase, or contract to purchase real estate or they would have required Zillow to compensate them for the interception, collection, and disclosure of their Website Communications.

95.    Zillow's intentional concealment of the interception, collection, and disclosure of website visitors' Website Communications using Session Replay Code embedded in www.zillow.com is material because it knows that consumers would not otherwise visit its website to search for, purchase, and contract to purchase real estate. Indeed, Zillow's concealment of such facts was intended to mislead consumers.

96.    Zillow's concealment, suppression, and omission of material facts was likely to mislead reasonable consumers under the circumstances, and thus constitutes an unfair and deceptive trade practice in violation of the ICFA.

97.    By failing to disclose and inform Plaintiff and the Class about its interception, collection, and disclosure of website visitors' Website Communications, Zillow violated section 505/2 of the ICFA.

98.     As a direct and proximate result of these unfair and deceptive practices, Plaintiff and each Class member has suffered actual harm in the form of money and/or property because the disclosure of their Website Communications has value as demonstrated by the collection and use of it by Zillow. The collection and use of this information has now diminished the value of such information to Plaintiff and the Class.

99.     As such, Plaintiff and the Class seek an order (1) requiring Zillow to cease the unfair practices described herein; (2) awarding actual damages; and (3) awarding reasonable attorneys' fees and costs.

100.     Zillow's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and Class members any time they visit Defendant's website with Session Replay Code enabled without their consent. Plaintiff and Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## COUNT III
### Invasion of Privacy – Intrusion Upon Seclusion

101.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

102.     Illinois common law recognizes the tort of invasion of privacy. The right to privacy is also embodied in the Illinois constitution.

103.     Plaintiff brings this claim individually and on behalf of the Class.

104.     Plaintiff and Class members had an objective, reasonable expectation of privacy in their Website Communications.

105.     Plaintiff and Class members did not consent to, authorize, or know about Zillow's intrusion at the time it occurred. Plaintiff and Class members never agreed that Zillow could collect or disclose their Website Communications.

24

106. Plaintiff and Class members had an objective interest in precluding the dissemination and/or misuse of their information and communications and in conducting their personal activities without intrusion or interference, including the right to not have their personal information intercepted and utilized for business gain.

107. Zillow intentionally intruded on Plaintiff's and Class members' private life, seclusion, or solitude, without consent.

108. Zillow's conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy.

109. Plaintiff and Class members were harmed by Zillow's wrongful conduct as Zillow's conduct has caused Plaintiff and the Class mental anguish and suffering arising from their loss of privacy and confidentiality of their electronic communications.

110. Zillow's conduct has needlessly harmed Plaintiff and the Class by capturing intimately personal facts and data in the form of their Website Communications. This disclosure and loss of privacy and confidentiality has caused Plaintiff and the Class to experience mental anguish, emotional distress, worry, fear, and other harms.

111. Additionally, given the monetary value of individual personal information, Defendant deprived Plaintiff and Class members of the economic value of their interactions with Defendant's website, without providing proper consideration for Plaintiff's and Class members' property.

112. Further, Zillow has improperly profited from its invasion of Plaintiff and Class members' privacy in its use of their data for its economic value.

FILED DATE: 9/15/2022 11:05 AM  2022CH09132

113.    As a direct and proximate result Zillow's conduct, Plaintiff and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

114.    Zillow's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and Class members any time they visit Defendant's website with session replay software enabled without their consent. Plaintiff and Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

### REQUEST FOR RELIEF

Plaintiff, individually and on behalf of the other members of the proposed Class, respectfully requests that the Court enter judgment in Plaintiff's and the Class's favor and against Defendant as follows:

A.    Certifying the Class and appointing Plaintiff as the Class representative;

B.    Appointing Plaintiff's counsel as class counsel;

C.    Declaring that Defendant's past conduct was unlawful, as alleged herein;

D.    Declaring Defendant's ongoing conduct is unlawful, as alleged herein;

E.    Enjoining Defendant from continuing the unlawful practices described herein, and awarding such injunctive and other equitable relief as the Court deems just and proper;

F.    Awarding Plaintiff and the Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

G.    Awarding Plaintiff and the Class members pre-judgment and post-judgment interest;

FILED DATE: 9/15/2022 11:05 AM    2022CH09132

FILED DATE: 9/15/2022 11:05 AM   2022CH09132

H.      Awarding Plaintiff and the Class members reasonable attorneys' fees, costs, and expenses; and

I.       Granting such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the Class, demands a trial by jury of any and all issues in this action so triable of right.

Dated: September 15, 2022                        Respectfully submitted,

                                          BY:    /s/ Katrina Carroll
                                                 **LYNCH CARPENTER, LLP**
                                                 KATRINA CARROLL
                                                 KYLE SHAMBERG
                                                 111 W. Washington Street
                                                 Suite 1240
                                                 Chicago, IL 60602
                                                 Office: 312.750.1265
                                                 Fax: 773.598.5609
                                                 katrina@lcllp.com
                                                 kyle@lcllp.com

                                                 GARY LYNCH
                                                 **LYNCH CARPENTER LLP**
                                                 1133 Penn Avenue
                                                 5th Floor
                                                 Pittsburgh, PA 15222
                                                 Office:  412.322.9243
                                                 Fax:     412.231.0246
                                                 gary@lcllp.com

27

# Exhibit B

# CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT – CHANCERY DIVISION

JILL STRELZIN, individually and on
behalf of all others similarly situated,

Plaintiff,

vs.

ZILLOW GROUP, INC.,

Defendant.

)
)
)
)
)
)
)
)
)
)
)

Case No. 2022CH09132

## NOTICE OF FILING OF REMOVAL

**TO THE CLERK:**

**PLEASE TAKE NOTICE** that Defendant Zillow Group, Inc. filed a Notice of Removal on October 14, 2022, in the United States District Court for the Northern District of Illinois, a copy of which is attached as Exhibit A. Pursuant to 28 U.S.C. § 1446(d), the filing of this Notice effects the removal of this case, and this Court shall proceed no further unless the case is remanded.

Respectfully submitted,

Dated: October 14, 2022

**BUCHANAN INGERSOLL & ROONEY PC**

By: */s/ David T. Cellitti*
David T. Cellitti (Bar No. 6272041)
401 E. Jackson Street, Suite 2400
Tampa, FL 33602
Tel. 813-222-8180
david.cellitti@bipc.com

*Counsel for Defendant Zillow Group, Inc.*

# Exhibit C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RYAN MARGULIS, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br><br>v.<br><br>ZILLOW GROUP, INC.,<br><br>      Defendant. | Case No. _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT - CLASS ACTION

Plaintiff Ryan Margulis ("Plaintiff"), individually and on behalf of all others similarly situated, hereby files this class action complaint against Defendant Zillow Group, Inc. ("Defendant" or "Zillow"), and in support thereof alleges the following:

## INTRODUCTION

1.      This is a class action brought against Zillow for surreptitiously intercepting the private electronic communications of visitors to its website, www.zillow.com, without their consent. Zillow knowingly directs third-party vendors, such as Microsoft Corporation, to embed snippets of JavaScript computer code ("Session Replay Code") on Zillow's website, which then deploys on each website visitor's internet browser for the purpose intercepting and recording the website visitor's private electronic communications with the Zillow website, including their mouse movements, clicks, keystrokes (such as text being entered into an information field or text box), URLs of web pages visited, and/or other electronic communications in real-time ("Website Communications"). These third-party vendors (collectively, "Session Replay Providers") create and deploy the Session Replay Code at Zillow's request.

1

2.      After intercepting and recording the Website Communications, Zillow and the Session Replay Providers use those Website Communications to recreate website visitors' entire visit to www.zillow.com. The Session Replay Providers create a video replay of the user's behavior on the website and provide it to Zillow for analysis. Zillow's directive to the Session Replay Providers to secretly deploy the Session Replay Code results in the electronic equivalent of "looking over the shoulder" of each visitor to the Zillow website for the entire duration of their website interaction.

3.      Zillow's conduct violates the Illinois Eavesdropping Act, 720 ILCS 5/14-1, *et seq.*, the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*., and constitutes an invasion of the privacy rights of website visitors.

4.      Plaintiff brings this action individually and on behalf of a class of all Illinois citizens whose Website Communications were intercepted at Zillow's direction and use of Session Replay Code embedded on the webpages of www.zillow.com and seeks all civil remedies provided under the causes of action, including but not limited to compensatory, statutory, and/or punitive damages, and attorneys' fees and costs.

## **PARTIES**

5.      Plaintiff Ryan Margulis is a citizen of the state of Illinois, and at all times relevant to this action, resided and was domiciled in Cook county, Illinois. Plaintiff is a citizen of Illinois.

6.      Defendant Zillow Group, Inc. is corporation organized under the laws of Washington, and its principal place of business is located at 1301 Second Ave., Floor 31, Seattle Washington, 98101. Defendant is a citizen of Washington.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class, including Plaintiff, is a citizen of a state different than Defendant.

8.     This Court has personal jurisdiction over Defendant because a substantial part of the events and conduct giving rise to Plaintiff's claims occurred in Illinois. The privacy violations complained of herein resulted from Defendant's purposeful and tortious acts directed towards citizens of Illinois while they were located within Illinois. At all relevant times, Defendant knew that its practices would directly result in collection of information from Illinois citizens while those citizens browse www.zillow.com. Defendant chose to avail itself of the business opportunities of making its real property and rental advertising services specifically available in Illinois (and specifically with respect to Illinois properties) and collecting real-time data from website visit sessions initiated by Illinoisans while located in Illinois, and the claims alleged herein arise from those activities.

9.     Zillow also knows that many users visit and interact with Zillow's websites while they are physically present in Illinois. Both desktop and mobile versions of Zillow's website allow a user to search for nearby properties by providing the user's "current location," as furnished by the location-determining tools of the device the user is using or by the user's IP address (*i.e.*, without requiring the user to manually input an address). Users' employment of automatic location services in this way means that Zillow is continuously made aware that its website is being visited

by people located in Illinois, and that such website visitors are being eavesdropped on in violation Illinois statutory and common law.

10.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

## FACTUAL ALLEGATIONS

### A.     Website User and Usage Data Have Immense Economic Value.

11.     The "world's most valuable resource is no longer oil, but data."[1]

12.     Earlier this year, Business News Daily reported that some businesses collect personal data (*i.e.*, gender, web browser cookies, IP addresses, and device IDs), engagement data (*i.e.*, how consumers interact with a business's website, applications, and emails), behavioral data (*i.e.*, customers' purchase histories and product usage information), and attitudinal data (*i.e.*, data on consumer satisfaction) from consumers.[2] This information is valuable to companies because they can use this data to improve customer experiences, refine their marketing strategies, capture data to sell it, and even to secure more sensitive consumer data.[3]

13.     In a consumer-driven world, the ability to capture and use customer data to shape products, solutions, and the buying experience is critically important to a business's success.

---

[1] *The world's most valuable resource is no longer oil, but data*, The Economist (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longeroil-but-data.

[2] Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)*, Business News Daily (Aug. 5, 2022), https://www.businessnewsdaily.com/10625-businesses-collecting-data.html.

[3] *Id.*

Research shows that organizations who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[4]

14.     In 2013, the Organization for Economic Cooperation and Development ("OECD") even published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[5] In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[6]

15.     OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [i.e. $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination of address, date of birth, social security number, credit record and military is estimated to cost USD 55."[7]

**B.      Website Users Have a Reasonable Expectation of Privacy in Their Interactions with Websites.**

16.     Consumers are skeptical and are wary about their data being collected. A report released by KPMG shows that "a full 86% of the respondents said they feel a growing concern about data privacy, while 78% expressed fears about the amount of data being collected."[8]

---

[4] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, *Capturing value from your customer data*, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data.

[5] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, NO. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.

[6] *Id.* at 25.

[7] *Id.*

[8] Lance Whitney, *Data privacy is a growing concern for more consumers*, TechRepublic (Aug. 17, 2021), https://www.techrepublic.com/article/data-privacy-is-a-growing-concern-for-more-consumers/.

17.     Another recent paper also indicates that most website visitors will assume their detailed interactions with a website will only be used by the website and not be shared with a party they know nothing about.[9] As such, website visitors reasonably expect that their interactions with a website should not be released to third parties unless explicitly stated.[10]

18.     Privacy polls and studies show that a majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

19.     A recent study by Consumer Reports shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[11]

20.     Moreover, according to a study by Pew Research Center, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.[12]

21.     Users act consistently with their expectation of privacy. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing

---

[9] *CUJO AI Recent Survey Reveals U.S. Internet Users Expectations and Concerns Towards Privacy and Online Tracking*, CUJO (May 26, 2020), https://www.prnewswire.com/news-releases/cujo-ai-recent-survey-reveals-us-internet-users-expectations-and-concerns-towards-privacy-and-online-tracking-301064970.html.

[10] Frances S. Grodzinsky, Keith W. Miller & Marty J. Wolf, *Session Replay Scripts: A Privacy Analysis*, The Information Society, 38:4, 257, 258 (2022).

[11] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, Consumer Reports (May 11, 2017), https://www.consumerreports.org/consumerreports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.

[12] *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, Pew Research Center, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-Confusedand-feeling-lack-of-control-over-their-personal-information/.

companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[13]

### C. How Session Replay Code Works.

22.     Session Replay Code, such as that implemented on www.zillow.com, enables website operators to record, save, and replay website visitors' interactions with a given website. The clandestinely deployed code provides online marketers and website designers with insights into the user experience by recording website visitors "as they click, scroll, type or navigate across different web pages."[14]

23.     While Session Replay Code is utilized by websites for some legitimate purposes, it goes well beyond normal website analytics when it comes to collecting the actual contents of communications between website visitors and websites. Unlike other online advertising tools, Session Replay Code allows a website to capture and record nearly every action a website visitor takes while visiting the website, including actions that reveal the visitor's personal or private sensitive data, sometimes even when the visitor does not intend to submit the data to the website operator, or has not finished submitting the data to the website operator.[15] As a result, website visitors "aren't just sharing data with the [web]site they're on . . . but also with an analytics service that may be watching over their shoulder."[16]

---

[13]     Margaret Taylor, *How Apple screwed Facebook*, Wired, (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.

[14]  Erin Gilliam Haije, *[Updated] Are Session Recording Tools a Risk to Internet Privacy?*, Mopinion (Mar. 7, 2018), https://mopinion.com/are-session-recording-tools-a-risk-to-internet-privacy/.

[15] *Id.*

[16] Eric Ravenscraft, *Almost Every Website You Visit Records Exactly How Your Mouse Moves*, Medium (Feb. 5, 2020), https://onezero.medium.com/almost-every-website-you-visit-records-exactly-how-your-mouse-moves-4134cb1cc7a0.

24.     Session Replay Code works by inserting computer code into the various event handling routines that web browsers use to receive input from users, thus intercepting the occurrence of actions the user takes. When a website delivers Session Replay Code to a user's browser, the browser will follow the code's instructions by sending responses in the form of "event" data to a designated third-party server. Typically, the server receiving the event data is controlled by the third-party entity that wrote the Session Replay Code, rather than the owner of the website where the code is installed.

25.     The types of events captured by Session Replay Code vary by specific product and configuration, but in general are wide-ranging and can encompass virtually every user action, including all mouse movements, clicks, scrolls, zooms, window resizes, keystrokes, text entry, and numerous other forms of a user's navigation and interaction through the website. In order to permit a reconstruction of a user's visit accurately, the Session Replay Code must be capable of capturing these events at hyper-frequent intervals, often just milliseconds apart. Events are typically accumulated and transmitted in blocks periodically throughout the user's website session, rather than after the user's visit to the website is completely finished.

26.     Unless specifically masked through configurations chosen by the website owner, some visible contents of the website may also be transmitted to the Session Replay Provider.

27.     Once the events from a user session have been recorded by a Session Replay Code, a website operator can view a visual reenactment of the user's visit through the Session Replay Provider, usually in the form of a video, meaning "[u]nlike typical analytics services that provide

aggregate statistics, these scripts are intended for the recording and playback of individual browsing sessions."[17]

28.     Because most Session Replay Codes will by default indiscriminately capture the maximum range of user-initiated events and content displayed by the website, researchers have found that a variety of highly sensitive information can be captured in event responses from website visitors, including medical conditions, credit card details, and other personal information displayed or entered on webpages.[18]

29.     Most alarming, Session Replay Code may capture data that the user did not even intentionally transmit to a website during a visit, and then make that data available to website owners when they access the session replay through the Session Replay Provider. For example, if a user writes information into a text form field, but then chooses not to click a "submit" or "enter" button on the website, the Session Replay Code may nevertheless cause the non-submitted text to be sent to the designated event-response-receiving server before the user deletes the text or leaves the page. This information will then be viewable to the website owner when accessing the session replay through the Session Replay Provider.

30.     Session Replay Code does not necessarily anonymize user sessions, either.

31.     First, if a user's entry of personally identifying information is captured in an event response, that data will become known and visible to both the Session Replay Provider and the website owner.

---

[17] Steven Englehardt, *No boundaries: Exfiltration of personal data by session-replay scripts*, Freedom to Tinker (Nov. 15, 2017), https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/.
[18] *Id.*

32.     Second, if a website displays user account information to a logged-in user, that content may be captured by Session Replay Code.

33.     Third, some Session Replay Providers explicitly offer website owners cookie functionality that permits linking a session to an identified user, who may be personally identified if the website owner has associated the user with an email address or username.[19]

34.     Session Replay Providers often create "fingerprints" that are unique to a particular user's combination of computer and browser settings, screen configuration, and other detectable information. The resulting fingerprint, which is often unique to a user and rarely changes, are collected across all sites that the Session Replay Provider monitors.

35.     When a user eventually identifies themselves to one of these websites (such as by filling in a form), the provider can then associate the fingerprint with the user identity and can then back-reference all of that user's other web browsing across other websites previously visited, including on websites where the user had intended to remain anonymous—even if the user explicitly indicated that they would like to remain anonymous by enabling private browsing.

36.     In addition to the privacy invasions caused by the diversion of user communications with websites to third-party Session Replay Providers, Session Replay Code also exposes website visitors to identity theft, online scams, and other privacy threats.[20] Indeed, "[t]he more copies of sensitive information that exist, the broader the attack surface, and when data is being collected [

---

[19] *Id.*; *see also FS.identify – Identifying users*, FullStory, https://help.fullstory.com/hc/en-us/articles/360020828113, (last visited Sep. 8, 2022).

[20] Juha Sarrinen, *Session Replay is a Major Threat to Privacy on the Web*, itnews (Nov. 16, 2017), https://www.itnews.com.au/news/session-replay-is-a-major-threat-to-privacy-on-the-web-477720.

] it may not be stored properly or have standard protections" increasing "the overall risk that data will someday publicly leak or be breached."[21]

37.    Recognizing the privacy concerns posed by Session Replay Code, in 2019 Apple required app developers to remove or properly disclose the use of analytics code that allow app developers to record how a user interacts with their iPhone apps or face immediate removal from the app store.[22] In announcing this decision, Apple stated: "Protecting user privacy is paramount in the Apple ecosystem. Our App Store Review Guidelines require that apps request explicit user consent and provide a clear visual indication when recording, logging, or otherwise making a record of user activity."[23]

**D.    Zillow Secretly Eavesdrops on its Website Visitors' Electronic Communications.**

38.    Zillow operates the website www.zillow.com. Zillow is the "leading online residential real estate" marketplace in the United States for consumers, connecting them to the information and real estate professionals they need to buy, sell, or rent a home.[24]

39.    Zillow has become "synonymous with residential real estate."[25] www.zillow.com is the most popular real estate website in the United States, with over thirty-six million unique

---

[21] Lily Hay Newman, *Covert 'Replay Sessions' Have Been harvesting Passwords by Mistake*, WIRED (Feb. 26, 2018), https://www.wired.com/story/covert-replay-sessions-harvesting-passwords/.
[22] Zack Whittaker, *Apple Tells App Developers to Disclose or Remove Screen Recording Code*, TechCrunch (Feb. 7, 2019), https://techcrunch.com/2019/02/07/apple-glassbox-apps/.
[23] *Id.*
[24] Zillow Group, Inc., *Form 10-K* (Dec. 31, 2021), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001617640/87bbbf30-39cb-4eb7-acdc-1b51265b9687.pdf ("Zillow 10-K").
[25] *Id.*

monthly visitors[26] and more than 135 million properties are listed on its website.[27] According to a 2021 Google Trends report, "[t]oday more people search 'Zillow' than 'real estate.'"[28]

40.     However, unbeknownst to the millions of individuals perusing Zillow's real estate listings, Zillow knowingly directs Session Replay Providers to embed various Session Replay Codes on its website to track and analyze website user interactions with www.zillow.com. Because the Session Replay Providers are unknown eavesdroppers to visitors to www.zillow.com, they are not parties to website visitors' Website Communications with Zillow.

41.     One such Session Replay Provider that Zillow procures is Microsoft.

42.     Microsoft is the owner and operator of a Session Replay Code titled Clarity, which provides basic information about website user sessions, interactions, and engagement, and breaks down users by device type, county, and other dimensions.[29]

43.     Zillow knowingly derives a benefit and/or information from the Website Communications intercepted and recorded at its direction. Upon information and belief, Zillow uses the intercepted Website Communications to replay website visitors' interactions with www.zillow.com, improve user interactions with its website, and to provide targeted real estate advertisements to its website visitors.

44.     Zillow's knowing direction and use of Microsoft Clarity's Session Replay Code, direction and use of other Session Replay Codes through various Session Replay Providers, and its knowing derivation of a benefit and/or information from the Website Communications

---

[26] *Most Popular Real Estate Websites in the United States as of October 2021, Based on Unique Monthly Visits*, Statista, https://www.statista.com/statistics/381468/most-popular-real-estate-websites-by-monthly-visits-usa/, (last visited Sep. 8, 2022).
[27] Zillow 10-K, *supra*, note 1.
[28] *Id.*
[29] Jono Alderson, *An Introduction to Microsoft Clarity*, Yoast, https://yoast.com/introduction-microsoft-clarity/#h-what-is-microsoft-clarity, (last visited Sep. 8, 2022).

surreptitiously intercepted and recorded by Session Replay Codes is a violation of Illinois statutory and common law.

### E. Plaintiff's and Class Members' Experience.

45.     Plaintiff has visited www.zillow.com on his mobile devices and computer while in Illinois.

46.     While visiting Zillow's website, Plaintiff fell victim to Defendant's unlawful monitoring, recording, and collection of Plaintiff's Website Communications with www.zillow.com.

47.     Unknown to Plaintiff, Zillow directs Session Replay Providers to embed Session Replay Code on its website.

48.     During the website visit, Plaintiff's Website Communications were captured by Session Replay Code and sent to various Session Replay Providers.

49.     For example, when visiting www.zillow.com, if a website user views a certain piece of property for rent or sale, that information is captured by the Session Replay Codes embedded on the website:



*Depicting information sent to one of the Service Replay Providers—Microsoft—through a Service Replay Code—Clarity—after viewing a Studio apartment priced at $1,488 while visiting www.zillow.com.*

50.     Similarly, when visiting www.zillow.com, if a user enters personal information in a text box to schedule a tour, that information is captured by the Session Replay Codes embedded on the website:



*Depicting information sent to one of the Service Replay Providers—Microsoft—through a Service Replay Code—Clarity—after entering a name (purple text) to a text box to schedule a tour of a property.*

51.     The eavesdropping by the Session Replay Code is ongoing during the visit and they intercept the contents of these communications between Plaintiff and Zillow with instantaneous transmissions to the Session Replay Providers, as illustrated below, in which only 30 milliseconds were required to send a packet of even response data, which would indicate whatever the website user had just done:



52.     The Session Replay Codes operate in the same manner for all putative Class members.

53.     Like Plaintiff, each Class member visited www.zillow.com with Session Replay Code embedded in it, and those Session Replay Codes intercepted the Class members' Website Communications with www.zillow.com by sending hyper-frequent logs of those communications to Session Replay Providers.

54.     Even if Zillow masks certain elements when it configures the settings of the Session Replay Code embedded on its website, any operational iteration of the Session Replay Code will, by its very nature and purpose, intercept the contents of communications between the website's visitors and the website owner.

55.     For example, even with heightened masking enabled, Session Replay Providers will still learn through the intercepted data exactly which pages a user navigates to, how the user moves

through the page (such as which areas the user zooms in on or interacted with), and additional substantive information.

56.     As a specific example, if a user types a particular address or zip code into Zillow's main search bar and initiates a search, even if the text entered into the search bar is masked, Session Replay Providers will still learn what is entered into the bar as soon as the search result page loads. This is so because the responsive search results will be displayed on the subsequent page, and the responsive content generated by Zillow will repeat the searched information back on the generated page. That information will not be masked even if user-inputted text is fully masked in a text field.

## CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

> All natural persons in the State of Illinois whose Website Communications were captured through the use of Session Replay Code embedded in www.zillow.com.

58.     Excluded from the class are Defendant, its parents, subsidiaries, affiliates, officers, and directors, all persons who make a timely election to be excluded from the class, the judge to whom this case is assigned and any immediate family members thereof, and the attorneys who enter their appearance in this action.

59.     **Numerosity:** The members of the Class are so numerous that individual joinder of all Class members is impracticable. The precise number of Class members and their identities may be obtained from the books and records of Zillow or the Session Replay Providers.

60.     **Commonality:** This action involves questions of law and fact that are common to the Class members. Such common questions include, but are not limited to: (a) whether Defendant employed Session Replay Providers to intercept and record Zillow's website visitors' Website Communications; (b) whether Defendant operated or participated in the operation of an

16

eavesdropping device; (c) whether Defendant derives a benefit or information from the illegal use of an eavesdropping device; (d) whether Defendant directed another to use an eavesdropping device illegally on its behalf; (e) whether Session Replay Code is an "eavesdropping device" used to intercept or record private electronic communications; (f) whether Defendant acquired the contents of website users' private electronic communications without their consent; (g) whether Plaintiff and Class members had a reasonable expectation of privacy in their Website communications; (f) whether Defendant violated the Illinois Eavesdropping Act 720 ILCS 5/14-1, *et seq.*; (g) whether Defendant's interception of Plaintiff's and Class members' private electronic communications is an unfair or deceptive act or practice; (h) whether Zillow's conduct violates the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* (i) whether Plaintiff and the Class members are entitled to equitable relief; and (j) whether Plaintiff and the Class members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

61.     **Typicality:** Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the uniform prohibited conduct described above. For instance, Plaintiff and each member of the Class had their electronic communications intercepted in violation of the law and their right to privacy. This uniform injury and the legal theories that underpin recovery make the claims of Plaintiff and the members of the Class typical of one another.

62.     **Adequacy of Representation:** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiff has no interest that is antagonistic to the interests of the Class, and Defendant

17

has no defenses unique to any Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor his counsel have any interest adverse to the interests of the other members of the Class.

63. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

64. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendant intercepted Plaintiff's and Class members' Website Communications, then Plaintiff and each Class member suffered damages by that conduct.

65. **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria and Class members may be readily identified through Zillow's books and records or the Session Replay Providers' books and records.

<u>**COUNT I**</u>
**Violation of Illinois Eavesdropping Act**
**720 ILCS 5/14-1, *et seq.***

66. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

18

67.     Plaintiff brings this claim individually and on behalf of the Class.

68.     The Illinois Eavesdropping Act (the "Act") prohibits (1) using an eavesdropping device in a surreptitious manner to overhear, transmit, or record all or any part of any private conversation; (2) intercepting, recording, or transcribing, in a surreptitious manner, any private electronic communication without consent; (3) manufacturing, assembling, distributing, or possessing any electronic, mechanical, eavesdropping, or other device knowing that or having reason to know that the design of the device renders it primarily useful for the purpose of surreptitious overhearing, transmitting, or recording of private conversations or the intersection; or (4) using or disclosing any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication without the consent of all parties to the private electronic communication. 720 ILCS 5/14-2.

69.     Any party to any conversation or private electronic communication upon which eavesdropping was practiced shall be entitled to (1) an injunction to prohibit further eavesdropping; (2) actual damages; and (3) punitive damages. punitive damages; 720 ILCS 5/14-6.

70.     "Eavesdropping device" is defined as any "any device capable of being used to hear or record oral conversation or intercept, or transcribe electronic communications whether such conversation or electronic communication is conducted in person, by telephone, or by any other means[.]" 720 ILCS 5/14-1(a).

71.     "Eavesdropper" is defined as "any person, including any law enforcement officer and any party to a private conversation, who operates or participates in the operation of any eavesdropping device contrary to the provisions of this Article or who acts as a principal, as defined in this Article." 720 ILCS 5/14-1(b).

19

72.     "Principle" is defined as "any person who: (1) knowingly employs another who illegally uses an eavesdropping device in the course of such employment; or (2) knowingly derives any benefit or information from the illegal use of an eavesdropping device by another; or (3) directs another to use an eavesdropping device illegally on his or her behalf." 720 ILCS 5/14-1(c).

73.     "Private electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or part by a wire, radio, pager, computer, electromagnetic, photo electronic or photo optical system, when the sending or receiving party intends the electronic communication to be private under circumstances reasonably justifying that expectation. A reasonable expectation shall include any expectation recognized by law, including, but not limited to, an expectation derived from a privilege, immunity, or right established by common law, Supreme Court rule, or the Illinois or United States Constitution." ILCS 5/14-1(e).

74.     "Surreptitious" is defined as being "obtained or made by stealth or deception, or executed through secrecy or concealment." 720 ILCS 5/14-1(g).

75.     Zillow is an "Eavesdropper" and "Principal" for purposes of the Act because it operates or participates in the operation of an eavesdropping device, knowingly employs another who illegally uses an eavesdropping device, derives a benefit or information from the illegal use of an eavesdropping device, and directs another to use an eavesdropping device illegally on its behalf.

76.     Session Replay Code like that operated and employed at Zillow's direction is a "eavesdropping device" used to transcribe electronic communications within the meaning of the Act.

20

77.     The Session Replay Providers are not a party to the Website Communications—Plaintiff and the Class only knew they were communicating with Zillow, not the Session Replay Providers.

78.     Plaintiff's and Class members' intercepted Website Communications constitute the private electronic communications and private conversations within the meaning of the Act.

79.     Zillow intentionally operated and employed Session Replay Code on its website to spy on, automatically and secretly, and intercept its website visitors' private electronic interactions communications with Zillow in real time.

80.     Plaintiff's and Class members' private electronic communications were intercepted contemporaneously with their transmission.

81.     Plaintiff and Class members had a reasonable expectation of privacy in their Website Communications based on the detailed information the Session Replay Code collected from Plaintiff and Class members.

82.     Plaintiff and Class members did not consent to having their Website Communications surreptitiously intercepted and recorded.

83.     Pursuant to 720 ILCS 5/14-6, Plaintiff and members of the Class are entitled to: (1) an injunction to prohibit further eavesdropping; (2) actual damages; and (3) punitive damages. punitive damages

84.     Zillow's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and Class members any time they visit Defendant's website with Session Replay Code enabled without their consent. Plaintiff and Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## <u>COUNT II</u>
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS 505/1** *et seq.*

85.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

86.     Plaintiff brings this claim individually and on behalf of the Class.

87.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* ("ICFA") protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

88.     The ICFA prohibits "unfair or deceptive acts or practices," including "misrepresentation or the concealment, suppression or omission of any material fact." 815 ILCS 505/2.

89.     The ICFA applies to Zillow's conduct described herein because it protects consumers in transactions that are intended to result, or which have resulted in the sale of goods or services.

90.     Zillow is a "person" within the meaning of ILCS 505/1(c) because it is a corporation.

91.     Plaintiff and members of the Class are "consumers" within the meaning of 815 ILCS 505/1(e) because they visited www.zillow.com to shop for, purchase, or contract to purchase "merchandise"—real estate—for their own use.

92.     Zillow's advertising, offering for sale, and sale of real estate on www.zillow.com is considered "trade" or "commerce" within the meaning of 815 ILCS 505/1(f).

93.     Zillow violated the ICFA by concealing material facts about www.zillow.com. Specifically, Zillow omitted and concealed that it directed Session Replay Providers to secretly

monitor, collect, transmit, and discloses its website visitors' Website Communications to the Session Replay Providers using Session Replay Code.

94.     Zillow's direction and employment of the Session Replay Providers and their Session Replay Codes to intercept, collect, and disclose website visitors' Website Communications are material to the transactions on www.zillow.com. Zillow is leading online residential real estate marketplace in the United States and Zillow does not disclose its use of Session Replay Code to secretly monitor and collect website visitors' Website Communications. Had Plaintiff and the Class members known that the Session Replay Codes (that collect, transmit, and disclose Website Communications to the Session Replay Providers) were embedded in Zillow's website, they would not have visited www.zillow.com to shop for, purchase, or contract to purchase real estate or they would have required Zillow to compensate them for the interception, collection, and disclosure of their Website Communications.

95.     Zillow's intentionally concealed the interception, collection, and disclosure of website visitors' Website Communications using Session Replay Code embedded in www.zillow.com is material because it knows that consumers would not otherwise visit its website to search for, purchase, and contract to purchase real estate. Indeed, Zillow's concealment of such facts was intended to mislead consumers.

96.     Zillow's concealment, suppression, and omission of material facts was likely to mislead reasonable consumers under the circumstances, and thus constitutes an unfair and deceptive trade practice in violation of the ICFA.

97.     By failing to disclose and inform Plaintiff and the Class about its interception, collection, and disclosure of website visitors' Website Communications, Zillow violated section 505/2 of the ICFA.

23

98.     As a direct and proximate result of these unfair and deceptive practices, Plaintiff and each Class member has suffered actual harm in the form of money and/or property because the disclosure of their Website Communications has value as demonstrated by the collection and use of it by Zillow. The collection and use of this information has now diminished the value of such information to Plaintiff and the Class.

99.     As such, Plaintiff and the Class seek an order (1) requiring Zillow to cease the unfair practices described herein; (2) awarding actual damages; and (3) awarding reasonable attorneys' fees and costs.

100.     Zillow's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and Class members any time they visit Defendant's website with Session Replay Code enabled without their consent. Plaintiff and Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## COUNT III
### Invasion of Privacy – Intrusion Upon Seclusion

101.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

102.     Illinois common law recognizes the tort of invasion of privacy. The right to privacy is also embodied in the Illinois constitution.

103.     Plaintiff brings this claim individually and on behalf of the Class.

104.     Plaintiff and Class members had an objective, reasonable expectation of privacy in their Website Communications.

105.     Plaintiff and Class members did not consent to, authorize, or know about Zillow's intrusion at the time it occurred. Plaintiff and Class members never agreed that Zillow could collect or disclose their Website Communications.

106.    Plaintiff and Class members had an objective interest in precluding the dissemination and/or misuse of their information and communications and in conducting their personal activities without intrusion or interference, including the right to not have their personal information intercepted and utilized for business gain.

107.    Zillow intentionally intruded on Plaintiff's and Class members' private life, seclusion, or solitude, without consent.

108.    Zillow's conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy.

109.    Plaintiff and Class members were harmed by Zillow's wrongful conduct as Zillow's conduct has caused Plaintiff and the Class mental anguish and suffering arising from their loss of privacy and confidentiality of their electronic communications.

110.    Zillow's conduct has needlessly harmed Plaintiff and the Class by capturing intimately personal facts and data in the form of their Website Communications. This disclosure and loss of privacy and confidentiality has caused Plaintiff and the Class to experience mental anguish, emotional distress, worry, fear, and other harms.

111.    Additionally, given the monetary value of individual personal information, Defendant deprived Plaintiff and Class members of the economic value of their interactions with Defendant's website, without providing proper consideration for Plaintiff's and Class members' property.

112.    Further, Zillow has improperly profited from its invasion of Plaintiff and Class members' privacy in its use of their data for its economic value.

113. As a direct and proximate result Zillow's conduct, Plaintiff and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

114. Zillow's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and Class members any time they visit Defendant's website with session replay software enabled without their consent. Plaintiff and Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## REQUEST FOR RELIEF

Plaintiff, individually and on behalf of the other members of the proposed Class, respectfully requests that the Court enter judgment in Plaintiff's and the Class's favor and against Defendant as follows:

A. Certifying the Class and appointing Plaintiff as the Class representative;

B. Appointing Plaintiff's counsel as class counsel;

C. Declaring that Defendant's past conduct was unlawful, as alleged herein;

D. Declaring Defendant's ongoing conduct is unlawful, as alleged herein;

E. Enjoining Defendant from continuing the unlawful practices described herein, and awarding such injunctive and other equitable relief as the Court deems just and proper;

F. Awarding Plaintiff and the Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

G. Awarding Plaintiff and the Class members pre-judgment and post-judgment interest;

H.   Awarding Plaintiff and the Class members reasonable attorneys' fees, costs, and expenses; and

I.   Granting such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and the Class, demands a trial by jury of any and all issues in this action so triable of right.

Dated: September 8, 2022                Respectfully submitted,

/s/ Jonathan M. Jagher
Jonathan M. Jagher
**FREED KANNER LONDON**
**& MILLEN LLC**
923 Fayette Street
Conshohocken, Pennsylvania 19428
(610) 234-6486
jjagher@fklmlaw.com

Douglas A. Millen
Michael E. Moskovitz
**FREED KANNER LONDON**
**& MILLEN LLC**
2201 Waukegan Road, Ste. 130
Bannockburn, IL 60015
(224) 632-4500
dmillen@fklmlaw.com
mmoskovitz@fklmlaw.com

# Exhibit D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MARK CONLISK and MICHAEL DEKHTYAR, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>ZILLOW GROUP, INC.,<br><br>      Defendant. | Case No. _____<br><br>**JURY TRIAL DEMANDED** |

### COMPLAINT - CLASS ACTION

Plaintiffs Mark Conlisk and Michael Dekhtyar ("Plaintiffs"), individually and on behalf of all others similarly situated, hereby file this class action complaint against Defendant Zillow Group, Inc. ("Defendant" or "Zillow"), and in support thereof alleges the following:

### INTRODUCTION

1. This is a class action brought against Zillow, the leading online homebuying marketplace, for surreptitiously intercepting the private electronic communications of visitors to its website, www.zillow.com, without their consent.

2. Zillow knowingly directs third-party vendors, such as Microsoft Corporation, to embed snippets of JavaScript computer code ("Session Replay Code") on Zillow's website, which then deploys on each website visitor's internet browser for the purpose intercepting and recording the website visitor's private electronic communications with the Zillow website, including their mouse movements, clicks, keystrokes (such as text being entered into an information field or text box), URLs of web pages visited, and/or other electronic communications in real-time ("Website

1

Communications"). These third-party vendors (collectively, "Session Replay Providers") create and deploy the Session Replay Code at Zillow's request.

3.       After intercepting and recording the Website Communications, Zillow and the Session Replay Providers use those Website Communications to recreate website visitors' entire visit to www.zillow.com. The Session Replay Providers create a video replay of the user's behavior on the website and provide it to Zillow for analysis. Zillow's directive to the Session Replay Providers to secretly deploy the Session Replay Code results in the electronic equivalent of "looking over the shoulder" of each visitor to the Zillow website for the entire duration of their website interaction.

4.       Zillow's conduct violates the Illinois Eavesdropping Act, 720 ILCS 5/14-1, *et seq.*, the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*, and constitutes an invasion of the privacy rights of website visitors.

5.       Plaintiffs bring this action individually and on behalf of a class of all Illinois citizens whose Website Communications were intercepted at Zillow's direction and use of Session Replay Code embedded on the webpages of www.zillow.com and seek all civil remedies provided under the causes of action, including but not limited to compensatory, statutory, and/or punitive damages, and attorneys' fees and costs.

**PARTIES**

*Plaintiff Mark Conlisk*

6.       Plaintiff Mark Conlisk is a citizen of the state of Illinois, and at all times relevant to this action, resided and was domiciled in Illinois. Plaintiff is a citizen of Illinois.

2

*Plaintiff Michael Dekhtyar*

7.      Plaintiff Michael Dekhtyar is a citizen of the state of Illinois, and at all times relevant to this action, resided and was domiciled in Illinois. Plaintiff is a citizen of Illinois.

*Defendant Zillow Group, Inc.*

8.      Defendant Zillow Group, Inc. is a corporation organized under the laws of Washington, and its principal place of business is located at 1301 Second Ave., Floor 31, Seattle Washington, 98101. Defendant is a citizen of Washington.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class, including the Plaintiffs, who are citizens of a state (Illinois) different than Defendant (Washington).

10.     This Court has personal jurisdiction over Defendant because a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in Illinois. The privacy violations complained of herein resulted from Defendant's purposeful and tortious acts directed towards citizens of Illinois while they were located within Illinois. At all relevant times, Defendant knew that its practices would directly result in collection of information from Illinois citizens while those citizens browse www.zillow.com. Defendant chose to avail itself of the business opportunities of making its real property and rental advertising services specifically available in Illinois (and specifically with respect to Illinois properties) and collecting real-time data from website visit sessions initiated by Illinoisans while located in Illinois, and the claims alleged herein arise from those activities.

3

11.     Zillow also knows that many users visit and interact with Zillow's websites while they are physically present in Illinois. Both desktop and mobile versions of Zillow's website allow a user to search for nearby properties by providing the user's "current location," as furnished by the location-determining tools of the device the user is using or by the user's IP address (*i.e.*, without requiring the user to manually input an address). Users' employment of automatic location services in this way means that Zillow is continuously made aware that its website is being visited by people located in Illinois, and that such website visitors are being eavesdropped on in violation Illinois statutory and common law.

12.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

## FACTUAL ALLEGATIONS

### A.     Website User and Usage Data Have Immense Economic Value.

13.     The "world's most valuable resource is no longer oil, but data."[1]

14.     Earlier this year, Business News Daily reported that some businesses collect personal data (*i.e.*, gender, web browser cookies, IP addresses, and device IDs), engagement data (*i.e.*, how consumers interact with a business's website, applications, and emails), behavioral data (*i.e.*, customers' purchase histories and product usage information), and attitudinal data (*i.e.*, data on consumer satisfaction) from consumers.[2] This information is valuable to companies because

---

[1] *The world's most valuable resource is no longer oil, but data*, The Economist (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longeroil-but-data.

[2] Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)*, Business News Daily (Aug. 5, 2022), https://www.businessnewsdaily.com/10625-businesses-collecting-data.html.

they can use this data to improve customer experiences, refine their marketing strategies, capture data to sell it, and even to secure more sensitive consumer data.[3]

15.    In a consumer-driven world, the ability to capture and use customer data to shape products, solutions, and the buying experience is critically important to a business's success. Research shows that organizations who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[4]

16.    In 2013, the Organization for Economic Cooperation and Development ("OECD") even published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[5] In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[6]

17.    OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [i.e. $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination of address, date of birth, social security number, credit record and military is estimated to cost USD 55."[7]

---

[3] *Id.*

[4] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, *Capturing value from your customer data*, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data.

[5] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, NO. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.

[6] *Id.* at 25.

[7] *Id.*

**B.** **Website Users Have a Reasonable Expectation of Privacy in Their Interactions with Websites.**

18.     Consumers are skeptical and are wary about their data being collected. A report released by KPMG shows that "a full 86% of the respondents said they feel a growing concern about data privacy, while 78% expressed fears about the amount of data being collected."[8]

19.     Another recent paper also indicates that most website visitors will assume their detailed interactions with a website will only be used by the website and not be shared with a party they know nothing about.[9] As such, website visitors reasonably expect that their interactions with a website should not be released to third parties unless explicitly stated.[10]

20.     Privacy polls and studies show that a majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

21.     A recent study by Consumer Reports shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[11]

---

[8] Lance Whitney, *Data privacy is a growing concern for more consumers*, TechRepublic (Aug. 17, 2021), https://www.techrepublic.com/article/data-privacy-is-a-growing-concern-for-more-consumers/.

[9] *CUJO AI Recent Survey Reveals U.S. Internet Users Expectations and Concerns Towards Privacy and Online Tracking*, CUJO (May 26, 2020), https://www.prnewswire.com/news-releases/cujo-ai-recent-survey-reveals-us-internet-users-expectations-and-concerns-towards-privacy-and-online-tracking-301064970.html.

[10] Frances S. Grodzinsky, Keith W. Miller & Marty J. Wolf, *Session Replay Scripts: A Privacy Analysis*, The Information Society, 38:4, 257, 258 (2022).

[11] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, Consumer Reports (May 11, 2017), https://www.consumerreports.org/consumerreports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.

22.      Moreover, according to a study by Pew Research Center, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.[12]

23.      Users act consistently with their expectation of privacy. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[13]

**C.      How Session Replay Code Works.**

24.      Session Replay Code, such as that implemented on www.zillow.com, enables website operators to record, save, and replay website visitors' interactions with a given website. The clandestinely deployed code provides online marketers and website designers with insights into the user experience by recording website visitors "as they click, scroll, type or navigate across different web pages."[14]

25.      While Session Replay Code is utilized by websites for some legitimate purposes, it goes well beyond normal website analytics when it comes to collecting the actual contents of communications between website visitors and websites. Unlike other online advertising tools, Session Replay Code allows a website to capture and record nearly every action a website visitor takes while visiting the website, including actions that reveal the visitor's personal or private sensitive data, sometimes even when the visitor does not intend to submit the data to the website

---

[12] *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, Pew Research Center, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-Confusedand-feeling-lack-of-control-over-their-personal-information/.

[13] Margaret Taylor, *How Apple screwed Facebook*, Wired, (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.

[14] Erin Gilliam Haije, *[Updated] Are Session Recording Tools a Risk to Internet Privacy?*, Mopinion (Mar. 7, 2018), https://mopinion.com/are-session-recording-tools-a-risk-to-internet-privacy/.

operator, or has not finished submitting the data to the website operator.[15] As a result, website visitors "aren't just sharing data with the [web]site they're on . . . but also with an analytics service that may be watching over their shoulder."[16]

26.     Session Replay Code works by inserting computer code into the various event handling routines that web browsers use to receive input from users, thus intercepting the occurrence of actions the user takes. When a website delivers Session Replay Code to a user's browser, the browser will follow the code's instructions by sending responses in the form of "event" data to a designated third-party server. Typically, the server receiving the event data is controlled by the third-party entity that wrote the Session Replay Code, rather than the owner of the website where the code is installed.

27.     The types of events captured by Session Replay Code vary by specific product and configuration, but in general are wide-ranging and can encompass virtually every user action, including all mouse movements, clicks, scrolls, zooms, window resizes, keystrokes, text entry, and numerous other forms of a user's navigation and interaction through the website. In order to permit a reconstruction of a user's visit accurately, the Session Replay Code must be capable of capturing these events at hyper-frequent intervals, often just milliseconds apart. Events are typically accumulated and transmitted in blocks periodically throughout the user's website session, rather than after the user's visit to the website is completely finished.

28.     Unless specifically masked through configurations chosen by the website owner, some visible contents of the website may also be transmitted to the Session Replay Provider.

---

[15] *Id.*

[16] Eric Ravenscraft, *Almost Every Website You Visit Records Exactly How Your Mouse Moves*, Medium (Feb. 5, 2020), https://onezero.medium.com/almost-every-website-you-visit-records-exactly-how-your-mouse-moves-4134cb1cc7a0.

29.     Once the events from a user session have been recorded by a Session Replay Code, a website operator can view a visual reenactment of the user's visit through the Session Replay Provider, usually in the form of a video, meaning "[u]nlike typical analytics services that provide aggregate statistics, these scripts are intended for the recording and playback of individual browsing sessions."[17]

30.     Because most Session Replay Codes will by default indiscriminately capture the maximum range of user-initiated events and content displayed by the website, researchers have found that a variety of highly sensitive information can be captured in event responses from website visitors, including medical conditions, credit card details, and other personal information displayed or entered on webpages.[18]

31.     Most alarming, Session Replay Code may capture data that the user did not even intentionally transmit to a website during a visit, and then make that data available to website owners when they access the session replay through the Session Replay Provider. For example, if a user writes information into a text form field, but then chooses not to click a "submit" or "enter" button on the website, the Session Replay Code may nevertheless cause the non-submitted text to be sent to the designated event-response-receiving server before the user deletes the text or leaves the page. This information will then be viewable to the website owner when accessing the session replay through the Session Replay Provider.

32.     Session Replay Code does not necessarily anonymize user sessions, either.

---

[17] Steven Englehardt, *No boundaries: Exfiltration of personal data by session-replay scripts*, Freedom to Tinker (Nov. 15, 2017), https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/.
[18] *Id.*

33.     First, if a user's entry of personally identifying information is captured in an event response, that data will become known and visible to both the Session Replay Provider and the website owner.

34.     Second, if a website displays user account information to a logged-in user, that content may be captured by Session Replay Code.

35.     Third, some Session Replay Providers explicitly offer website owners cookie functionality that permits linking a session to an identified user, who may be personally identified if the website owner has associated the user with an email address or username.[19]

36.     Session Replay Providers often create "fingerprints" that are unique to a particular user's combination of computer and browser settings, screen configuration, and other detectable information. The resulting fingerprint, which is often unique to a user and rarely changes, are collected across all sites that the Session Replay Provider monitors.

37.     When a user eventually identifies themselves to one of these websites (such as by filling in a form), the provider can then associate the fingerprint with the user identity and can then back-reference all of that user's other web browsing across other websites previously visited, including on websites where the user had intended to remain anonymous—even if the user explicitly indicated that they would like to remain anonymous by enabling private browsing.

38.     In addition to the privacy invasions caused by the diversion of user communications with websites to third-party Session Replay Providers, Session Replay Code also exposes website visitors to identity theft, online scams, and other privacy threats.[20] Indeed, "[t]he more copies of

---

[19] *Id.*; *see also FS.identify – Identifying users*, FullStory, https://help.fullstory.com/hc/en-us/articles/360020828113, (last visited Sep. 8, 2022).

[20] Juha Sarrinen, *Session Replay is a Major Threat to Privacy on the Web*, itnews (Nov. 16, 2017), https://www.itnews.com.au/news/session-replay-is-a-major-threat-to-privacy-on-the-web-477720.

sensitive information that exist, the broader the attack surface, and when data is being collected [ ] it may not be stored properly or have standard protections" increasing "the overall risk that data will someday publicly leak or be breached."[21]

39.     Recognizing the privacy concerns posed by Session Replay Code, in 2019 Apple required app developers to remove or properly disclose the use of analytics code that allow app developers to record how a user interacts with their iPhone apps or face immediate removal from the app store.[22] In announcing this decision, Apple stated: "Protecting user privacy is paramount in the Apple ecosystem. Our App Store Review Guidelines require that apps request explicit user consent and provide a clear visual indication when recording, logging, or otherwise making a record of user activity."[23]

**D.     Zillow Secretly Eavesdrops on its Website Visitors' Electronic Communications.**

40.     Zillow operates the website www.zillow.com. Zillow is the "leading online residential real estate" marketplace in the United States for consumers, connecting them to the information and real estate professionals they need to buy, sell, or rent a home.[24]

41.     Zillow has become "synonymous with residential real estate."[25] www.zillow.com is the most popular real estate website in the United States, with over thirty-six million unique

---

[21] Lily Hay Newman, *Covert 'Replay Sessions' Have Been harvesting Passwords by Mistake*, WIRED (Feb. 26, 2018), https://www.wired.com/story/covert-replay-sessions-harvesting-passwords/.

[22] Zack Whittaker, *Apple Tells App Developers to Disclose or Remove Screen Recording Code*, TechCrunch (Feb. 7, 2019), https://techcrunch.com/2019/02/07/apple-glassbox-apps/.

[23] *Id.*

[24] Zillow Group, Inc., *Form 10-K* (Dec. 31, 2021), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001617640/87bbbf30-39cb-4eb7-acdc-1b51265b9687.pdf ("Zillow 10-K").

[25] *Id.*

monthly visitors[26] and more than 135 million properties are listed on its website.[27] According to a 2021 Google Trends report, "[t]oday more people search 'Zillow' than 'real estate.'"[28]

42.    However, unbeknownst to the millions of individuals perusing Zillow's real estate listings, Zillow knowingly directs Session Replay Providers to embed various Session Replay Codes on its website to track and analyze website user interactions with www.zillow.com. Because the Session Replay Providers are unknown eavesdroppers to visitors to www.zillow.com, they are not parties to website visitors' Website Communications with Zillow.

43.    One such Session Replay Provider that Zillow procures is Microsoft.

44.    Microsoft is the owner and operator of a Session Replay Code titled Clarity, which provides basic information about website user sessions, interactions, and engagement, and breaks down users by device type, county, and other dimensions.[29]

45.    Zillow knowingly derives a benefit and/or information from the Website Communications intercepted and recorded at its direction. Upon information and belief, Zillow uses the intercepted Website Communications to replay website visitors' interactions with www.zillow.com, improve user interactions with its website, and to provide targeted real estate advertisements to its website visitors.

46.    Zillow's knowing direction and use of Microsoft Clarity's Session Replay Code, direction and use of other Session Replay Codes through various Session Replay Providers, and its knowing derivation of a benefit and/or information from the Website Communications

---

[26] *Most Popular Real Estate Websites in the United States as of October 2021, Based on Unique Monthly Visits*, Statista, https://www.statista.com/statistics/381468/most-popular-real-estate-websites-by-monthly-visits-usa/, (last visited Sep. 8, 2022).
[27] Zillow 10-K, *supra*, note 1.
[28] *Id.*
[29] Jono Alderson, *An Introduction to Microsoft Clarity*, Yoast, https://yoast.com/introduction-microsoft-clarity/#h-what-is-microsoft-clarity, (last visited Sep. 8, 2022).

surreptitiously intercepted and recorded by Session Replay Codes is a violation of Illinois statutory and common law.

### E. Plaintiffs' and Class Members' Experiences.

47. Plaintiffs have each independently visited www.zillow.com on his device while in Illinois on at least one occasion.

48. While visiting Zillow's website, Plaintiffs fell victim to Defendant's unlawful monitoring, recording, and collection of Plaintiffs' Website Communications with www.zillow.com.

49. Unknown to Plaintiffs, Zillow directs Session Replay Providers to embed Session Replay Code on its website.

50. During the website visit(s), Plaintiffs' Website Communications were captured by Session Replay Code and sent to various Session Replay Providers.

51. For example, when visiting www.zillow.com, if a website user views a certain piece of property for rent or sale, that information is captured by the Session Replay Codes embedded on the website:



*Depicting information sent to one of the Service Replay Providers—Microsoft—through a Service Replay Code—Clarity—after viewing a Studio apartment priced at $1,488 while visiting www.zillow.com.*

52.     Similarly, when visiting www.zillow.com, if a user enters personal information in a text box to schedule a tour, that information is captured by the Session Replay Codes embedded on the website:



*Depicting information sent to one of the Service Replay Providers—Microsoft—through a Service Replay Code—Clarity—after entering a name (purple text) to a text box to schedule a tour of a property.*

53.     The eavesdropping by the Session Replay Code is ongoing during the visit and they intercept the contents of these communications between Plaintiffs and Zillow with instantaneous transmissions to the Session Replay Providers, as illustrated below, in which only 30 milliseconds were required to send a packet of even response data, which would indicate whatever the website user had just done:



54. The Session Replay Codes operate in the same manner for all putative Class members.

55. Like Plaintiffs, each Class member visited www.zillow.com with Session Replay Code embedded in it, and those Session Replay Codes intercepted the Class members' Website Communications with www.zillow.com by sending hyper-frequent logs of those communications to Session Replay Providers.

56. Even if Zillow masks certain elements when it configures the settings of the Session Replay Code embedded on its website, any operational iteration of the Session Replay Code will, by its very nature and purpose, intercept the contents of communications between the website's visitors and the website owner.

57. For example, even with heightened masking enabled, Session Replay Providers will still learn through the intercepted data exactly which pages a user navigates to, how the user moves

15

through the page (such as which areas the user zooms in on or interacted with), and additional substantive information.

58.     As a specific example, if a user types a particular address or zip code into Zillow's main search bar and initiates a search, even if the text entered into the search bar is masked, Session Replay Providers will still learn what is entered into the bar as soon as the search result page loads. This is so because the responsive search results will be displayed on the subsequent page, and the responsive content generated by Zillow will repeat the searched information back on the generated page. That information will not be masked even if user-inputted text is fully masked in a text field.

## **CLASS ACTION ALLEGATIONS**

59.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

> All natural persons in the State of Illinois whose Website Communications were captured through the use of Session Replay Code embedded in www.zillow.com.

60.     Excluded from the class are Defendant, its parents, subsidiaries, affiliates, officers, and directors, all persons who make a timely election to be excluded from the class, the judge to whom this case is assigned and any immediate family members thereof, and the attorneys who enter their appearance in this action.

61.     **Numerosity:** The members of the Class are so numerous that individual joinder of all Class members is impracticable. The precise number of Class members and their identities may be obtained from the books and records of Zillow or the Session Replay Providers.

62.     **Commonality:** This action involves questions of law and fact that are common to the Class members. Such common questions include, but are not limited to: (a) whether Defendant employed Session Replay Providers to intercept and record Zillow's website visitors' Website Communications; (b) whether Defendant operated or participated in the operation of an

16

eavesdropping device; (c) whether Defendant derives a benefit or information from the illegal use of an eavesdropping device; (d) whether Defendant directed another to use an eavesdropping device illegally on its behalf; (e) whether Session Replay Code is an "eavesdropping device" used to intercept or record private electronic communications; (f) whether Defendant acquired the contents of website users' private electronic communications without their consent; (g) whether Plaintiffs and Class members had a reasonable expectation of privacy in their Website communications; (f) whether Defendant violated the Illinois Eavesdropping Act 720 ILCS 5/14-1, *et seq.*; (g) whether Defendant's interception of Plaintiffs' and Class members' private electronic communications is an unfair or deceptive act or practice; (h) whether Zillow's conduct violates the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* (i) whether Plaintiffs and the Class members are entitled to equitable relief; and (j) whether Plaintiffs and the Class members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

63.     **Typicality:** Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the uniform prohibited conduct described above. For instance, Plaintiffs and each member of the Class had their electronic communications intercepted in violation of the law and their right to privacy. This uniform injury and the legal theories that underpin recovery make the claims of Plaintiffs and the members of the Class typical of one another.

64.     **Adequacy of Representation:** Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiffs have no interest that is antagonistic to the interests of the Class, and

Defendant has no defenses unique to any Plaintiff(s). Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the interests of the other members of the Class.

65. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

66. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiffs and each member of the Class. If Defendant intercepted Plaintiffs' and Class members' Website Communications, then Plaintiffs and each Class member suffered damages by that conduct.

67. **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria and Class members may be readily identified through Zillow's books and records or the Session Replay Providers' books and records.

**COUNT I**
**Violation of Illinois Eavesdropping Act**
**720 ILCS 5/14-1, *et seq.***

68. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

69.     Plaintiffs bring this claim individually and on behalf of the Class.

70.     The Illinois Eavesdropping Act (the "Act") prohibits (1) using an eavesdropping device in a surreptitious manner to overhear, transmit, or record all or any part of any private conversation; (2) intercepting, recording, or transcribing, in a surreptitious manner, any private electronic communication without consent; (3) manufacturing, assembling, distributing, or possessing any electronic, mechanical, eavesdropping, or other device knowing that or having reason to know that the design of the device renders it primarily useful for the purpose of surreptitious overhearing, transmitting, or recording of private conversations or the intersection; or (4) using or disclosing any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication without the consent of all parties to the private electronic communication. 720 ILCS 5/14-2.

71.     Any party to any conversation or private electronic communication upon which eavesdropping was practiced shall be entitled to (1) an injunction to prohibit further eavesdropping; (2) actual damages; and (3) punitive damages. punitive damages; 720 ILCS 5/14-6.

72.     "Eavesdropping device" is defined as any "any device capable of being used to hear or record oral conversation or intercept, or transcribe electronic communications whether such conversation or electronic communication is conducted in person, by telephone, or by any other means[.]" 720 ILCS 5/14-1(a).

73.     "Eavesdropper" is defined as "any person, including any law enforcement officer and any party to a private conversation, who operates or participates in the operation of any eavesdropping device contrary to the provisions of this Article or who acts as a principal, as defined in this Article." 720 ILCS 5/14-1(b).

74.     "Principle" is defined as "any person who: (1) knowingly employs another who illegally uses an eavesdropping device in the course of such employment; or (2) knowingly derives any benefit or information from the illegal use of an eavesdropping device by another; or (3) directs another to use an eavesdropping device illegally on his or her behalf." 720 ILCS 5/14-1(c).

75.     "Private electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or part by a wire, radio, pager, computer, electromagnetic, photo electronic or photo optical system, when the sending or receiving party intends the electronic communication to be private under circumstances reasonably justifying that expectation. A reasonable expectation shall include any expectation recognized by law, including, but not limited to, an expectation derived from a privilege, immunity, or right established by common law, Supreme Court rule, or the Illinois or United States Constitution." ILCS 5/14-1(e).

76.     "Surreptitious" is defined as being "obtained or made by stealth or deception, or executed through secrecy or concealment." 720 ILCS 5/14-1(g).

77.     Zillow is an "Eavesdropper" and "Principal" for purposes of the Act because it operates or participates in the operation of an eavesdropping device, knowingly employs another who illegally uses an eavesdropping device, derives a benefit or information from the illegal use of an eavesdropping device, and directs another to use an eavesdropping device illegally on its behalf.

78.     Session Replay Code like that operated and employed at Zillow's direction is a "eavesdropping device" used to transcribe electronic communications within the meaning of the Act.

20

79. The Session Replay Providers are not a party to the Website Communications—Plaintiffs and the Class only knew they were communicating with Zillow, not the Session Replay Providers.

80. Plaintiffs' and Class members' intercepted Website Communications constitute the private electronic communications and private conversations within the meaning of the Act.

81. Zillow intentionally operated and employed Session Replay Code on its website to spy on, automatically and secretly, and intercept its website visitors' private electronic interactions communications with Zillow in real time.

82. Plaintiffs' and Class members' private electronic communications were intercepted contemporaneously with their transmission.

83. Plaintiffs and Class members had a reasonable expectation of privacy in their Website Communications based on the detailed information the Session Replay Code collected from Plaintiffs and Class members.

84. Plaintiffs and Class members did not consent to having their Website Communications surreptitiously intercepted and recorded.

85. Pursuant to 720 ILCS 5/14-6, Plaintiff and members of the Class are entitled to: (1) an injunction to prohibit further eavesdropping; (2) actual damages; and (3) punitive damages. punitive damages

86. Zillow's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiffs and Class members any time they visit Defendant's website with Session Replay Code enabled without their consent. Plaintiffs and Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## COUNT II
### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act
### 815 ILCS 505/1 *et seq.*

87.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

88.    Plaintiffs bring this claim individually and on behalf of the Class.

89.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* ("ICFA") protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

90.    The ICFA prohibits "unfair or deceptive acts or practices," including "misrepresentation or the concealment, suppression or omission of any material fact." 815 ILCS 505/2.

91.    The ICFA applies to Zillow's conduct described herein because it protects consumers in transactions that are intended to result, or which have resulted in the sale of goods or services.

92.    Zillow is a "person" within the meaning of ILCS 505/1(c) because it is a corporation.

93.    Plaintiffs and members of the Class are "consumers" within the meaning of 815 ILCS 505/1(e) because they visited www.zillow.com to shop for, purchase, or contract to purchase "merchandise"—real estate—for their own use.

94.    Zillow's advertising, offering for sale, and sale of real estate on www.zillow.com is considered "trade" or "commerce" within the meaning of 815 ILCS 505/1(f).

95.    Zillow violated the ICFA by concealing material facts about www.zillow.com. Specifically, Zillow omitted and concealed that it directed Session Replay Providers to secretly

monitor, collect, transmit, and discloses its website visitors' Website Communications to the Session Replay Providers using Session Replay Code.

96.     Zillow's direction and employment of the Session Replay Providers and their Session Replay Codes to intercept, collect, and disclose website visitors' Website Communications are material to the transactions on www.zillow.com. Zillow is leading online residential real estate marketplace in the United States and Zillow does not disclose its use of Session Replay Code to secretly monitor and collect website visitors' Website Communications. Had Plaintiffs and the Class members known that the Session Replay Codes (that collect, transmit, and disclose Website Communications to the Session Replay Providers) were embedded in Zillow's website, they would not have visited www.zillow.com to shop for, purchase, or contract to purchase real estate or they would have required Zillow to compensate them for the interception, collection, and disclosure of their Website Communications.

97.     Zillow's intentionally concealed the interception, collection, and disclosure of website visitors' Website Communications using Session Replay Code embedded in www.zillow.com is material because it knows that consumers would not otherwise visit its website to search for, purchase, and contract to purchase real estate. Indeed, Zillow's concealment of such facts was intended to mislead consumers.

98.     Zillow's concealment, suppression, and omission of material facts was likely to mislead reasonable consumers under the circumstances, and thus constitutes an unfair and deceptive trade practice in violation of the ICFA.

99.     By failing to disclose and inform Plaintiffs and the Class about its interception, collection, and disclosure of website visitors' Website Communications, Zillow violated section 505/2 of the ICFA.

100.     As a direct and proximate result of these unfair and deceptive practices, Plaintiffs and each Class member has suffered actual harm in the form of money and/or property because the disclosure of their Website Communications has value as demonstrated by the collection and use of it by Zillow. The collection and use of this information has now diminished the value of such information to Plaintiffs and the Class.

101.     As such, Plaintiffs and the Class seek an order (1) requiring Zillow to cease the unfair practices described herein; (2) awarding actual damages; and (3) awarding reasonable attorneys' fees and costs.

102.     Zillow's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and Class members any time they visit Defendant's website with Session Replay Code enabled without their consent. Plaintiffs and Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

### COUNT III
**Invasion of Privacy – Intrusion Upon Seclusion**

103.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

104.     Plaintiffs bring this claim individually and on behalf of the Class.

105.     Illinois common law recognizes the tort of invasion of privacy. The right to privacy is also embodied in the Illinois constitution.

106.     Plaintiffs and Class members had an objective, reasonable expectation of privacy in their Website Communications.

107.     Plaintiffs and Class members did not consent to, authorize, or know about Zillow's intrusion at the time it occurred. Plaintiffs and Class members never agreed that Zillow could collect or disclose their Website Communications.

108. Plaintiffs and Class members had an objective interest in precluding the dissemination and/or misuse of their information and communications and in conducting their personal activities without intrusion or interference, including the right to not have their personal information intercepted and utilized for business gain.

109. Zillow intentionally intruded on Plaintiffs' and Class members' private life, seclusion, or solitude, without consent.

110. Zillow's conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy.

111. Plaintiffs and Class members were harmed by Zillow's wrongful conduct as Zillow's conduct has caused Plaintiffs and the Class mental anguish and suffering arising from their loss of privacy and confidentiality of their electronic communications.

112. Zillow's conduct has needlessly harmed Plaintiffs and the Class by capturing intimately personal facts and data in the form of their Website Communications. This disclosure and loss of privacy and confidentiality has caused Plaintiffs and the Class to experience mental anguish, emotional distress, worry, fear, and other harms.

113. Additionally, given the monetary value of individual personal information, Defendant deprived Plaintiffs and Class members of the economic value of their interactions with Defendant's website, without providing proper consideration for Plaintiffs' and Class members' property.

114. Further, Zillow has improperly profited from its invasion of Plaintiffs and Class members' privacy in its use of their data for its economic value.

115.    As a direct and proximate result Zillow's conduct, Plaintiffs and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

116.    Zillow's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiffs and Class members any time they visit Defendant's website with session replay software enabled without their consent. Plaintiffs and Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## REQUEST FOR RELIEF

Plaintiffs, individually and on behalf of the other members of the proposed Class, respectfully requests that the Court enter judgment in Plaintiffs' and the Class's favor and against Defendant as follows:

A.    Certifying the Class and appointing Plaintiffs as the Class representatives;

B.    Appointing Plaintiffs' counsel as class counsel;

C.    Declaring that Defendant's past conduct was unlawful, as alleged herein;

D.    Declaring Defendant's ongoing conduct is unlawful, as alleged herein;

E.    Enjoining Defendant from continuing the unlawful practices described herein, and awarding such injunctive and other equitable relief as the Court deems just and proper;

F.    Awarding Plaintiffs and the Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

G.    Awarding Plaintiffs and the Class members pre-judgment and post-judgment interest;

H.      Awarding Plaintiffs and the Class members reasonable attorneys' fees, costs, and expenses; and

I.      Granting such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and the Class, demands a trial by jury of any and all issues in this action so triable of right.


DATED: September 19, 2022                Respectfully Submitted,


                                    *s/ Gary M. Klinger*
                                    Gary M. Klinger
                                    **MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
                                    227 W. Monroe Street, Suite 2100
                                    Chicago, IL 60606
                                    Phone: 866.252.0878
                                    gklinger@milberg.com


                                    Nick Suciu III
                                    **MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
                                    6905 Telegraph Road, Suite 115
                                    Bloomfield Hills, MI 48301
                                    Tel: (313) 303-3472
                                    nsuciu@milberg.com

Query    Reports    Utilities    Help    Log Out

GILBERT

# United States District Court
## Northern District of Illinois - CM/ECF NextGen 1.6.3 (Chicago)
## CIVIL DOCKET FOR CASE #: 1:22-cv-05644

Strelzin v. Zillow Group, Inc.                              Date Filed: 10/14/2022
Assigned to: Honorable Steven C. Seeger                     Jury Demand: Plaintiff
Case in other court: Circuit Court of Cook County, Illinois,   Nature of Suit: 360 P.I.: Other
                  2022CH09132                                Jurisdiction: Diversity
Cause: 28:1332 Diversity-Personal Injury

**Plaintiff**

**Jill Strelzin**                          represented by   **Katrina Carroll**
*individually and on behalf of all other*                  Lynch Carpenter LLP
*similarly situated*                                        111 West Washington Street
                                                       Suite 1240
                                                       Chicago, IL 60602
                                                       (312) 750-1265
                                                       Fax: Not a member
                                                       Email: katrina@lcllp.com
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Zillow Group, Inc.**                      represented by   **David T Cellitti**
                                                       Buchanan Ingersoll & Rooney PC
                                                       401 E. Jackson Street, Suite 2400
                                                       Tempa, FL 33602-5236
                                                       (813) 222-1137
                                                       Fax: Not a member
                                                       Email: david.cellitti@bipc.com
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/14/2022 | 1 | NOTICE of Removal from Circuit Court of Cook County, Illinois, case number (2022CH09132) filed by Zillow Group, Inc. Filing fee $ 402, receipt number AILNDC-19946139. (Attachments: # 1 Exhibits A through D)(Cellitti, David) (Entered: 10/14/2022) |
| 10/14/2022 | 2 | CIVIL Cover Sheet (Cellitti, David) (Entered: 10/14/2022) |
| 10/14/2022 | 3 | ATTORNEY Appearance for Defendant Zillow Group, Inc. by David T Cellitti (Cellitti, David) (Entered: 10/14/2022) |
| 10/14/2022 | | CASE ASSIGNED to the Honorable Steven C. Seeger. Designated as Magistrate Judge the |

| | | Honorable Jeffrey T. Gilbert. Case assignment: Random assignment. (emc, ) (Entered: 10/14/2022) |
|---|---|---|
| 10/14/2022 | 4 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by Zillow Group, Inc. (Cellitti, David) (Entered: 10/14/2022) |
| 10/17/2022 | 5 | MINUTE entry before the Honorable Steven C. Seeger: An initial status report is due by January 2, 2023. Counsel must read the Standing Order entitled "Initial Status Conferences and Joint Initial Status Reports" on the Court's website. The parties must confer as required by Rule 26(f) about the nature, scope, and duration of discovery. The parties must submit two documents to the Court. First, the parties must file the Joint Initial Status Report under Rule 26(f) on the docket. A Word version of the Joint Initial Status Report is available on the Court's website. All parties must participate in the preparation and filing of the Joint Initial Status Report. The Court requires a joint report, so a filing by one side or the other is not sufficient. Second, the parties must email a Word version of a proposed Scheduling Order under Rule 16(b) to the Court's proposed order inbox. Lead counsel for the parties must participate in filing the initial status report. Plaintiff must serve this Order on all other parties. If the defendant has not been served with process, plaintiff's counsel must contact the Courtroom Deputy at jessica_j_ramos@ilnd.uscourts.gov to reschedule the initial status report deadline. Plaintiff should not file the Joint Initial Status Report before the defendant(s) has been served with process. The parties must discuss settlement in good faith and make a serious attempt to resolve this case amicably. All counsel of record must read and comply with this Court's Standing Orders on its webpage. Please pay special attention to the Standing Orders about Depositions and Discovery. Mailed notice. (jjr, ) (Entered: 10/17/2022) |
| 10/17/2022 | 6 | MAILED Notice of Removal letter to counsel of record. (jn, ) (Entered: 10/17/2022) |
| 10/17/2022 | | CLERK'S NOTICE: Pursuant to Local Rule 73.1(b), a United States Magistrate Judge of this court is available to conduct all proceedings in this civil action. If all parties consent to have the currently assigned United States Magistrate Judge conduct all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings, all parties must sign their names on the attached Consent To form. This consent form is eligible for filing only if executed by all parties. The parties can also express their consent to jurisdiction by a magistrate judge in any joint filing, including the Joint Initial Status Report or proposed Case Management Order. (jn, ) (Entered: 10/17/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/19/2022 12:44:04 | | |
| **PACER Login:** | samanthasouthall | **Client Code:** | 0106198-000001-SS |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-05644 |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |