# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

JILL ADAMS and JILL ADAMS as Natural
Mother and Next Friend of her minor child,
H.A., individually and on behalf of all others
similarly situated,

      Plaintiff,

v.

ZILLOW GROUP, INC.,

      Defendant.

Case No.  4:22-cv-1023

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Jill Adams and Jill Adams as Natural Mother and Next Friend of her minor child, H.A. (collectively referred to as "Plaintiff"), individually and on behalf of all others similarly situated, hereby files this class action complaint against Defendant Zillow Group, Inc. ("Defendant" or "Zillow"), and in support thereof alleges the following:

### INTRODUCTION

1.    This is a class action brought against Zillow for surreptitiously intercepting the private electronic communications of visitors to its website, www.zillow.com, without their consent. Zillow knowingly directs third-party vendors, such as Microsoft Corporation, to embed snippets of JavaScript computer code ("Session Replay Code") on Zillow's website, which then deploys on each website visitor's internet browser for the purpose intercepting and recording the website visitor's private electronic communications with the Zillow website, including their mouse movements, clicks, keystrokes (such as text being entered into an information field or text box), URLs of web pages visited, and/or other electronic communications in real-time ("Website Communications"). These third-party vendors (collectively, "Session Replay Providers") create

and deploy the Session Replay Code at Zillow's request.

2.     After intercepting and recording the Website Communications, Zillow and the Session Replay Providers use those Website Communications to recreate website visitors' entire visit to www.zillow.com. The Session Replay Providers create a video replay of the user's behavior on the website and provide it to Zillow for analysis. Zillow's directive to the Session Replay Providers to secretly deploy the Session Replay Code results in the electronic equivalent of "looking over the shoulder" of each visitor to the Zillow website for the entire duration of their website interaction.

3.     Zillow's conduct violates the Missouri Wiretap Act, Mo. Ann. Stat. §§ 542.400 *et seq.*, the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010 *et seq.*, and constitutes an invasion of the privacy rights of website visitors.

4.     Plaintiff brings this action individually and on behalf of a class of all Missouri citizens whose Website Communications were intercepted at Zillow's direction and use of Session Replay Code embedded on the webpages of www.zillow.com and seeks all civil remedies provided under the causes of action, including but not limited to compensatory, statutory, and/or punitive damages, and attorneys' fees and costs.

## PARTIES

5.     Plaintiff Jill Adams, herself and as Natural Mother and Next Friend of her minor child, H.A., is a citizen of the state of Missouri, and at all times relevant to this action, resided and was domiciled in Saint Louis County, Missouri.

6.     Plaintiff Jill Adams' minor child, H.A., is a citizen of the state of Missouri, and at all times relevant to this action, resided and was domiciled in Saint Louis County, Missouri.

7.     Plaintiff Jill Adams has consented to serve as next friend of minor, H.A.

8.     Defendant Zillow Group, Inc. is corporation organized under the laws of Washington, and its principal place of business is located at 1301 Second Ave., Floor 31, Seattle Washington, 98101. Defendant is a citizen of Washington.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class, including Plaintiff, is a citizen of a state different than Defendant.

10.     This Court has personal jurisdiction over Defendant because a substantial part of the events and conduct giving rise to Plaintiff's claims occurred in Missouri. The privacy violations complained of herein resulted from Defendant's purposeful and tortious acts directed towards citizens of Missouri while they were located within Missouri. At all relevant times, Defendant knew that its practices would directly result in collection of information from Missouri citizens while those citizens browse www.zillow.com. Defendant chose to avail itself of the business opportunities of making its real property and rental advertising services specifically available in Missouri (and specifically with respect to Missouri properties) and collecting real-time data from website visit sessions initiated by Missourians while located in Missouri, and the claims alleged herein arise from those activities.

11.     Zillow also knows that many users visit and interact with Zillow's websites while they are physically present in Missouri. Both desktop and mobile versions of Zillow's website allow a user to search for nearby properties by providing the user's "current location," as furnished by the location-determining tools of the device the user is using or by the user's IP address (*i.e.*,

without requiring the user to manually input an address), as does the Zillow App. Users'
employment of automatic location services in this way means that Zillow is continuously made
aware that its website is being visited by people located in Missouri, and that such website visitors
are being eavesdropped on in violation Missouri statutory and common law.

12.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because
a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this
District.

## FACTUAL ALLEGATIONS

**A.      Website User and Usage Data Have Immense Economic Value.**

13.     The "world's most valuable resource is no longer oil, but data."[1]

14.     Earlier this year, Business News Daily reported that some businesses collect
personal data (*i.e.*, gender, web browser cookies, IP addresses, and device IDs), engagement data
(*i.e.*, how consumers interact with a business's website, applications, and emails), behavioral data
(*i.e.*, customers' purchase histories and product usage information), and attitudinal data (*i.e.*, data
on consumer satisfaction) from consumers.[2] This information is valuable to companies because
they can use this data to improve customer experiences, refine their marketing strategies, capture
data to sell it, and even to secure more sensitive consumer data.[3]

15.     In a consumer-driven world, the ability to capture and use customer data to shape
products, solutions, and the buying experience is critically important to a business's success.

---

[1] *The world's most valuable resource is no longer oil, but data*, The Economist (May 6, 2017),
https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-
longeroil-but-data.
[2] Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)*,
Business News Daily (Aug. 5, 2022), https://www.businessnewsdaily.com/10625-businesses-
collecting-data.html.
[3] *Id.*

Research shows that organizations who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[4]

16.　　In 2013, the Organization for Economic Cooperation and Development ("OECD") even published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[5] In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[6]

17.　　OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [i.e. $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination of address, date of birth, social security number, credit record and military is estimated to cost USD 55."[7]

**B.　　Website Users Have a Reasonable Expectation of Privacy in Their Interactions with Websites.**

18.　　Consumers are skeptical and are wary about their data being collected. A report released by KPMG shows that "a full 86% of the respondents said they feel a growing concern about data privacy, while 78% expressed fears about the amount of data being collected."[8]

19.　　Another recent paper also indicates that most website visitors will assume their

---

[4] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, *Capturing value from your customer data*, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data.

[5] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, NO. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.

[6] *Id.* at 25.

[7] *Id.*

[8] Lance Whitney, *Data privacy is a growing concern for more consumers*, TechRepublic (Aug. 17, 2021), https://www.techrepublic.com/article/data-privacy-is-a-growing-concern-for-more-consumers/.

5

detailed interactions with a website will only be used by the website and not be shared with a party they know nothing about.[9] As such, website visitors reasonably expect that their interactions with a website should not be released to third parties unless explicitly stated.[10]

20.      Privacy polls and studies show that a majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

21.      A recent study by Consumer Reports shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[11]

22.      Moreover, according to a study by Pew Research Center, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.[12]

23.      Users act consistently with their expectation of privacy. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not

---

[9] *CUJO AI Recent Survey Reveals U.S. Internet Users Expectations and Concerns Towards Privacy and Online Tracking*, CUJO (May 26, 2020), https://www.prnewswire.com/news-releases/cujo-ai-recent-survey-reveals-us-internet-users-expectations-and-concerns-towards-privacy-and-online-tracking-301064970.html.

[10] Frances S. Grodzinsky, Keith W. Miller & Marty J. Wolf, *Session Replay Scripts: A Privacy Analysis*, The Information Society, 38:4, 257, 258 (2022).

[11] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, Consumer Reports (May 11, 2017), https://www.consumerreports.org/consumerreports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.

[12] *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, Pew Research Center, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-Confusedand-feeling-lack-of-control-over-their-personal-information/.

6

to allow such tracking.[13]

**C. How Session Replay Code Works.**

24. Session Replay Code, such as that implemented on www.zillow.com, enables website operators to record, save, and replay website visitors' interactions with a given website. The clandestinely deployed code provides online marketers and website designers with insights into the user experience by recording website visitors "as they click, scroll, type or navigate across different web pages."[14]

25. While Session Replay Code is utilized by websites for some legitimate purposes, it goes well beyond normal website analytics when it comes to collecting the actual contents of communications between website visitors and websites. Unlike other online advertising tools, Session Replay Code allows a website to capture and record nearly every action a website visitor takes while visiting the website, including actions that reveal the visitor's personal or private sensitive data, sometimes even when the visitor does not intend to submit the data to the website operator, or has not finished submitting the data to the website operator.[15] As a result, website visitors "aren't just sharing data with the [web]site they're on . . . but also with an analytics service that may be watching over their shoulder."[16]

26. Session Replay Code works by inserting computer code into the various event handling routines that web browsers use to receive input from users, thus intercepting the

---

[13] Margaret Taylor, *How Apple screwed Facebook*, Wired, (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.

[14] Erin Gilliam Haije, *[Updated] Are Session Recording Tools a Risk to Internet Privacy?*, Mopinion (Mar. 7, 2018), https://mopinion.com/are-session-recording-tools-a-risk-to-internet-privacy/.

[15] *Id.*

[16] Eric Ravenscraft, *Almost Every Website You Visit Records Exactly How Your Mouse Moves*, Medium (Feb. 5, 2020), https://onezero.medium.com/almost-every-website-you-visit-records-exactly-how-your-mouse-moves-4134cb1cc7a0.

7

occurrence of actions the user takes. When a website delivers Session Replay Code to a user's browser, the browser will follow the code's instructions by sending responses in the form of "event" data to a designated third-party server. Typically, the server receiving the event data is controlled by the third-party entity that wrote the Session Replay Code, rather than the owner of the website where the code is installed.

27.     The types of events captured by Session Replay Code vary by specific product and configuration, but in general are wide-ranging and can encompass virtually every user action, including all mouse movements, clicks, scrolls, zooms, window resizes, keystrokes, text entry, and numerous other forms of a user's navigation and interaction through the website. In order to permit a reconstruction of a user's visit accurately, the Session Replay Code must be capable of capturing these events at hyper-frequent intervals, often just milliseconds apart. Events are typically accumulated and transmitted in blocks periodically throughout the user's website session, rather than after the user's visit to the website is completely finished.

28.     Unless specifically masked through configurations chosen by the website owner, some visible contents of the website may also be transmitted to the Session Replay Provider.

29.     Once the events from a user session have been recorded by a Session Replay Code, a website operator can view a visual reenactment of the user's visit through the Session Replay Provider, usually in the form of a video, meaning "[u]nlike typical analytics services that provide aggregate statistics, these scripts are intended for the recording and playback of individual browsing sessions."[17]

30.     Because most Session Replay Codes will by default indiscriminately capture the

---

[17] Steven Englehardt, *No boundaries: Exfiltration of personal data by session-replay scripts*, Freedom to Tinker (Nov. 15, 2017), https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/.

maximum range of user-initiated events and content displayed by the website, researchers have found that a variety of highly sensitive information can be captured in event responses from website visitors, including medical conditions, credit card details, and other personal information displayed or entered on webpages.[18]

31.     Most alarming, Session Replay Code may capture data that the user did not even intentionally transmit to a website during a visit, and then make that data available to website owners when they access the session replay through the Session Replay Provider. For example, if a user writes information into a text form field, but then chooses not to click a "submit" or "enter" button on the website, the Session Replay Code may nevertheless cause the non-submitted text to be sent to the designated event-response-receiving server before the user deletes the text or leaves the page. This information will then be viewable to the website owner when accessing the session replay through the Session Replay Provider.

32.     Session Replay Code does not necessarily anonymize user sessions, either.

33.     First, if a user's entry of personally identifying information is captured in an event response, that data will become known and visible to both the Session Replay Provider and the website owner.

34.     Second, if a website displays user account information to a logged-in user, that content may be captured by Session Replay Code.

35.     Third, some Session Replay Providers explicitly offer website owners cookie functionality that permits linking a session to an identified user, who may be personally identified if the website owner has associated the user with an email address or username.[19]

---

[18] *Id.*

[19] *Id.*; *see also FS.identify – Identifying users*, FullStory, https://help.fullstory.com/hc/en-us/articles/360020828113, (last visited Sep. 8, 2022).

36.     Session Replay Providers often create "fingerprints" that are unique to a particular user's combination of device and browser settings, screen configuration, and other detectable information. The resulting fingerprint, which is often unique to a user and rarely changes, are collected across all sites that the Session Replay Provider monitors.

37.     When a user eventually identifies themselves to one of these websites (such as by filling in a form), the provider can then associate the fingerprint with the user identity and can then back-reference all of that user's other web browsing across other websites previously visited, including on websites where the user had intended to remain anonymous—even if the user explicitly indicated that they would like to remain anonymous by enabling private browsing.

38.     In addition to the privacy invasions caused by the diversion of user communications with websites to third-party Session Replay Providers, Session Replay Code also exposes website visitors to identity theft, online scams, and other privacy threats.[20] Indeed, "[t]he more copies of sensitive information that exist, the broader the attack surface, and when data is being collected [ ] it may not be stored properly or have standard protections" increasing "the overall risk that data will someday publicly leak or be breached."[21]

39.     Recognizing the privacy concerns posed by Session Replay Code, in 2019 Apple required app developers to remove or properly disclose the use of analytics code that allow app developers to record how a user interacts with their iPhone apps or face immediate removal from

---

[20] Juha Sarrinen, *Session Replay is a Major Threat to Privacy on the Web*, itnews (Nov. 16, 2017), https://www.itnews.com.au/news/session-replay-is-a-major-threat-to-privacy-on-the-web-477720.
[21] Lily Hay Newman, *Covert 'Replay Sessions' Have Been harvesting Passwords by Mistake*, WIRED (Feb. 26, 2018), https://www.wired.com/story/covert-replay-sessions-harvesting-passwords/.

10

the app store.[22] In announcing this decision, Apple stated: "Protecting user privacy is paramount in the Apple ecosystem. Our App Store Review Guidelines require that apps request explicit user consent and provide a clear visual indication when recording, logging, or otherwise making a record of user activity."[23]

     **D.    Zillow Secretly Eavesdrops on its Website Visitors' Electronic Communications.**

    40.    Zillow operates the website www.zillow.com. Zillow is the "leading online residential real estate" marketplace in the United States for consumers, connecting them to the information and real estate professionals they need to buy, sell, or rent a home.[24]

    41.    Zillow has become "synonymous with residential real estate."[25] www.zillow.com is the most popular real estate website in the United States, with over thirty-six million unique monthly visitors[26] and more than 135 million properties are listed on its website.[27] According to a 2021 Google Trends report, "[t]oday more people search 'Zillow' than 'real estate.'"[28]

    42.    However, unbeknownst to the millions of individuals perusing Zillow's real estate listings, Zillow knowingly directs Session Replay Providers to embed various Session Replay Codes on its website to track and analyze website user interactions with www.zillow.com. Because the Session Replay Providers are unknown eavesdroppers to visitors to www.zillow.com, they are

---

[22] Zack Whittaker, *Apple Tells App Developers to Disclose or Remove Screen Recording Code*, TechCrunch (Feb. 7, 2019), https://techcrunch.com/2019/02/07/apple-glassbox-apps/.
[23] *Id.*
[24] Zillow Group, Inc., *Form 10-K* (Dec. 31, 2021), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001617640/87bbbf30-39cb-4eb7-acdc-1b51265b9687.pdf ("Zillow 10-K").
[25] *Id.*
[26] *Most Popular Real Estate Websites in the United States as of October 2021, Based on Unique Monthly Visits*, Statista, https://www.statista.com/statistics/381468/most-popular-real-estate-websites-by-monthly-visits-usa/, (last visited Sep. 8, 2022).
[27] Zillow 10-K, *supra*, note 1.
[28] *Id.*

not parties to website visitors' Website Communications with Zillow.

43. One such Session Replay Provider that Zillow procures is Microsoft.

44. Microsoft is the owner and operator of a Session Replay Code titled Clarity, which provides basic information about website user sessions, interactions, and engagement, and breaks down users by device type, county, and other dimensions.[29]

45. Zillow knowingly derives a benefit and/or information from the Website Communications intercepted and recorded at its direction. Upon information and belief, Zillow uses the intercepted Website Communications to replay website visitors' interactions with www.zillow.com, improve user interactions with its website, and to provide targeted real estate advertisements to its website visitors.

46. Zillow's knowing direction and use of Microsoft Clarity's Session Replay Code, direction and use of other Session Replay Codes through various Session Replay Providers, and its knowing derivation of a benefit and/or information from the Website Communications surreptitiously intercepted and recorded by Session Replay Codes is a violation of Missouri statutory and common law.

### E. Plaintiffs' and Class Members' Experience.

47. Plaintiff has visited www.zillow.com on their respective devices while in Missouri. Specifically, Plaintiff Jill Adams visited www.zillow.com via the web browser on both her mobile phone and computer, and also used the Zillow App on her mobile phone. Plaintiff's minor child, H.A., visited www.zillow.com via the web browser on her phone.

48. While visiting Zillow's website, Plaintiff fell victim to Defendant's unlawful

---

[29] Jono Alderson, *An Introduction to Microsoft Clarity*, Yoast, https://yoast.com/introduction-microsoft-clarity/#h-what-is-microsoft-clarity, (last visited Sep. 8, 2022).

monitoring, recording, and collection of Plaintiff's Website Communications with www.zillow.com.

49.     Unknown to Plaintiff, Zillow directs Session Replay Providers to embed Session Replay Code on its website.

50.     During the website visit, Plaintiff's Website Communications were captured by Session Replay Code and sent to various Session Replay Providers.

51.     For example, when visiting www.zillow.com, if a website user views a certain piece of property for rent or sale, that information is captured by the Session Replay Codes embedded on the website:



*Depicting information sent to one of the Service Replay Providers—Microsoft—through a Service Replay Code—Clarity—after viewing a Studio apartment priced at $1,488 while visiting www.zillow.com.*

52.     Similarly, when visiting www.zillow.com, if a user enters personal information in a text box to schedule a tour, that information is captured by the Session Replay Codes embedded on the website:

4892-7682-1300, v. 2



*Depicting information sent to one of the Service Replay Providers—Microsoft—through a Service Replay Code—Clarity—after entering a name (purple text) to a text box to schedule a tour of a property.*

53.     The eavesdropping by the Session Replay Code is ongoing during the visit and they intercept the contents of these communications between Plaintiff and Zillow with instantaneous transmissions to the Session Replay Providers, as illustrated below, in which only 30 milliseconds were required to send a packet of event response data, which would indicate whatever the website user had just done:



54.     The Session Replay Codes operate in the same manner for all putative Class members.

55.     Like Plaintiff, each member of the Classes visited www.zillow.com with Session Replay Code embedded in it, and those Session Replay Codes intercepted the members of the Classes' Website Communications with www.zillow.com by sending hyper-frequent logs of those communications to Session Replay Providers.

56.     Even if Zillow masks certain elements when it configures the settings of the Session Replay Code embedded on its website, any operational iteration of the Session Replay Code will, by its very nature and purpose, intercept the contents of communications between the website's visitors and the website owner.

57.     For example, even with heightened masking enabled, Session Replay Providers will still learn through the intercepted data exactly which pages a user navigates to, how the user moves

15

through the page (such as which areas the user zooms in on or interacted with), and additional substantive information.

58.     As a specific example, if a user types a particular address or zip code into Zillow's main search bar and initiates a search, even if the text entered into the search bar is masked, Session Replay Providers will still learn what is entered into the bar as soon as the search result page loads. This is so because the responsive search results will be displayed on the subsequent page, and the responsive content generated by Zillow will repeat the searched information back on the generated page. That information will not be masked even if user-inputted text is fully masked in a text field.

## CLASS ACTION ALLEGATIONS

59.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

> All natural persons in the State of Missouri whose Website Communications were captured through the use of Session Replay Code embedded in www.zillow.com.

60.     Plaintiff also brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Subclass:

> All natural persons in the State of Missouri who were minors at the time their Website Communications were captured through the use of Session Replay Code embedded in www.zillow.com.

61.      The Subclass is the "Minor Subclass;" both the class and subclass are collectively referred to as the "Classes."

62.     Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers, and directors, all persons who make a timely election to be excluded from the Classes, the judge to whom this case is assigned and any immediate family members thereof, and the attorneys who enter their appearance in this action.

63.     Plaintiff reserves the right to expand, limit, modify, or amend the Class and

16

Subclass definition, including the addition of one or more subclasses, in connection with Plaintiff's motion for class certification, or at any other time, based upon, *inter alia,* changing circumstances and/or new facts obtained during discovery.

64. **Numerosity:** The members of the Classes are so numerous that individual joinder of all members of the Classes is impracticable. The precise number of members of the Classes and their identities may be obtained from the books and records of Zillow or the Session Replay Providers.

65. **Commonality:** This action involves questions of law and fact that are common to the members of the Classes. Such common questions include, but are not limited to: (a) whether Defendant employed Session Replay Providers to intercept and record Zillow's website visitors' Website Communications; (b) whether Defendant operated or participated in the operation of an eavesdropping device; (c) whether Defendant derives a benefit or information from the illegal use of an eavesdropping device; (d) whether Defendant directed another to use an eavesdropping device illegally on its behalf; (e) whether Session Replay Code is an "eavesdropping device" used to intercept or record private electronic communications; (f) whether Defendant acquired the contents of website users' private electronic communications without their consent; (g) whether Plaintiff and members of the Classes had a reasonable expectation of privacy in their Website communications; (f) whether Defendant violated the Missouri Wiretap Act, Mo. Ann. Stat. §§ 542.400 *et seq.*; (g) whether Defendant's interception of Plaintiff's and Class and Subclass members' private electronic communications is an unfair or deceptive act or practice; (h) whether Zillow's conduct violates the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010 *et seq.* (i) whether Plaintiff and the members of the Classes are entitled to equitable relief; and (j) whether Plaintiff and the members of the Classes are entitled to actual, statutory, punitive, or other

17

forms of damages, and other monetary relief.

66.     **Typicality:** Plaintiff's claims are typical of the other Class and Subclass members' claims because, among other things, all members of the Classes were comparably injured through the uniform prohibited conduct described above. For instance, Plaintiff and each member of the Classes had their electronic communications intercepted in violation of the law and their right to privacy. This uniform injury and the legal theories that underpin recovery make the claims of Plaintiff and the members of the Classes typical of one another.

67.     **Adequacy of Representation:** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Classes. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiff has no interest that is antagonistic to the interests of the Classes, and Defendant has no defenses unique to any Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so. Neither Plaintiff nor her counsel have any interest adverse to the interests of the other members of the Classes.

68.     **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Classes is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

69.     **Predominance:** Common questions of law and fact predominate over any

questions affecting only individual members of the Classes. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Classes. If Defendant intercepted Plaintiff's and Class and Subclass members' Website Communications, then Plaintiff and each Class and Subclass member suffered damages by that conduct.

70. **Ascertainability:** Members of the Classes are ascertainable. Class membership is defined using objective criteria and members of the Classes may be readily identified through Zillow's books and records or the Session Replay Providers' books and records.

**COUNT I**
**Violation of Missouri Wiretap Act,**
**Mo. Ann. Stat. §§ 542.400 *et seq.***

71. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

72. Plaintiff brings this claim individually and on behalf of the Classes.

73. The Missouri wiretap statute broadly prohibits the interception, disclosure or use of any wire, oral or electronic communication. Mo. Stat. § 542.402.

74. Any person whose wire communication is intercepted, disclosed, or used in violation of sections 542,00 to 542.422 shall (1) have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications; and (2) be entitled to recover from any such person: (a) actual damages, but not less than liquidated damages computed at the rate of one hundred dollars a day for each day of violation or ten thousand dollars whichever is greater; (b) punitive damages on a showing of a willful or intentional violation of sections 542.400 to 542.422; and (c) A reasonable attorney's fee

19

and other litigation costs reasonably incurred.  Mo. Stat. § 542.218.

75.      "Wire communication" is defined as "any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception including the use of such connection in a switching station furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of local, state or interstate communications." Mo. Stat. § 542.200(12).

76.      A "Person" is "defined as any employee, or agent of this state or political subdivision of this state, and any individual, partnership, association, joint stock company, trust, or corporation."  Mo. Stat. § 542.200(9).

77.      "Intercept" is defined as "the aural acquisition of the contents of any wire communication through the use of any electronic or mechanical device, including but not limited to interception by one spouse of another spouse."  Mo. Stat. § 542.200(6).

78.      "Electronic, mechanical, or other device" is defined as "any device or apparatus which can be used to intercept a wire communication other than: (a)  Any telephone or telegraph instrument, equipment or facility, or any component thereof, owned by the user or furnished to the subscriber or user by a communications common carrier in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business or being used by a communications common carrier in the ordinary course of its business or by an investigative office or law enforcement officer in the ordinary course of his duties; or (b)  A hearing aid or similar device being used to correct subnormal hearing to not better than normal." Mo. Stat. § 542.200(5).

79.      "Contents," "when used with respect to any wire communication, includes any information concerning the identity of the parties, the substance, purport, or meaning of that

20

communication." Mo. Stat. § 542.200(3).

80. An "Aggrieved person" is defined as "a person who was a party to any intercepted wire communication or a person against whom the interception was directed." Mo. Stat. § 542.200 (1).

81. Zillow is a "Person" for purposes of the Act because it is a corporation.

82. Session Replay Code like that operated and employed at Zillow's direction is an "electronic, mechanical or other device" used to transcribe electronic communications and to intercept a wire communication within the meaning of the Act.

83. The Session Replay Providers are not a party to the Website Communications— Plaintiff and the Classes only knew they were communicating with Zillow, not the Session Replay Providers.

84. Plaintiff's and Class and Subclass members' intercepted Website Communications constitute wire communications within the meaning of the Act.

85. Zillow intentionally operated and employed Session Replay Code on its website to spy on, automatically and secretly, and intercept its website visitors' private electronic interactions communications with Zillow in real time, which are Contents within the meaning of the Act.

86. Plaintiff's and Class and Subclass members' private electronic communications were intercepted contemporaneously with their transmission.

87. Plaintiff and members of the Classes had a reasonable expectation of privacy in their Website Communications based on the detailed information the Session Replay Code collected from Plaintiff and members of the Classes.

88. Plaintiff and members of the Classes did not consent to having their Website Communications surreptitiously intercepted and recorded and are Aggrieved persons within the

21

meaning of the Act.

89.     Pursuant to Mo. Stat. § 542.418, Plaintiff and members of the Classes are entitled to: (1) actual damages; (2) statutory damages including liquidated damages at $100 per day of violation or $10,000, whichever is greater, and (3) punitive damages.  Plaintiff is also entitled to an award of attorney's fees and expenses.

90.     Zillow's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and members of the Classes any time they visit Defendant's website with Session Replay Code enabled without their consent. Plaintiff and members of the Classes are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

**COUNT II**
**Violation of Missouri's Merchandising Practices Act**
**Mo. Rev. Stat. § 407.010 *et seq.***

91.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

92.     Plaintiff brings this claim individually and on behalf of the Classes.

93.     The Missouri Merchandising Practice Act (for the purposes of this section, "MPA") protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

94.     The Missouri MPA makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. § 407.020.

95.     Plaintiff, individually and on behalf of the Classes, is entitled to bring this action pursuant to Mo. Rev. Stat. § 407.025, which provides in relevant part that: (a) Any person who purchases or leases merchandise primarily for personal, family or household purposes and thereby

22

suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020, may bring a private civil action in either the circuit court of the county in which the seller or lessor resides or in which the transaction complained of took place, to recover actual damages. The court may, in its discretion, award to the prevailing party attorney's fees, based on the amount of time reasonably expended, and may provide such equitable relief as it deems necessary or proper.

96.    Zillow is a "person" within the meaning of the Mo. Rev. Stat. § 407.010(5) in that Zillow is a domestic "[…] for-profit […] corporation."

97.    Plaintiffs and members of the Classes are "persons" under the MPA in that they are natural person or a natural person's legal representative, and they visited www.zillow.com to utilize the Zillow search engine for personal, family, and/or household use. Furthermore, Plaintiff Jill Adams visited www.zillow.com to utilize the Zillow search engine to shop for, purchase, and/or contract to purchase "merchandise"—real estate—for personal, family, and/or household use. Plaintiff Jill Adams also downloaded and used the Zillow App for personal, family, and/or household purposes.

98.    The MPA applies to Zillow's conduct described herein because it protects consumers in transactions that are intended to result, or which have resulted in the sale of goods or services.

99.    The MMPA defines "merchandise" as any objects, wares, goods, commodities, intangibles, real estate, or services. *See* Mo. Rev. Stat. § 407.010. Thus, the real estate search engine regarding millions of for-sale and rental listings, the Zestimate® home value service, and/or local professionals connector are services that Zillow provides to its website visitors are merchandise within the meaning of the Act. Plaintiffs and members of the class also

23

received Zillow's offer to use a search engine and/or look at a Zestimate and accepted that offer by using the search engine and/or looking at a Zestimate under the act, relying on the Terms of Use of the Website.

100.    "Trade" or "commerce" is defined as "the advertising, offering for sale, sale, or distribution, or any combination thereof, of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situated." Zillow's advertising, offering for sale, and sale of its real estate search engine and the real estate located thereon on www.zillow.com is considered "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

101.    The Missouri Attorney General has promulgated regulations defining the meaning of unfair practice as used in the above statute. Specifically, Mo. Code Regs. tit. 15, § 60-8.020, provides:

(1) An unfair practice is any practice which—

    (A) Either—

        1. Offends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or its interpretive decisions; or

    2. Is unethical, oppressive or unscrupulous; and

    (B) Presents a risk of, or causes, substantial injury to consumers.

(2) Proof of deception, fraud, or misrepresentation is not required to prove unfair practices as used in section 407.020.1., RSMo. (*See, Federal Trade Commission v. Sperry and Hutchinson Co.*, 405 U.S. 233, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972); *Marshall v. Miller*, 302 N.C. 539, 276 S.E.2d 397 (N.C. 1981); *see also*, Restatement, Second, Contracts, sections 364 and 365).

102.     Pursuant to Mo. Rev. Stat. §407.020 and Mo. Code Regs. Tit. 15, § 60- 8.020, Defendant's acts and omissions fall within the meaning of "unfair."

103.     Missouri case law provides that the MMPA's "literal words cover *every practice imaginable and every unfairness to whatever degree*." *Conway v. CitiMortgage, Inc.*, 438 S.W.3d 410, 416 (Mo. 2014) (quoting *Ports Petroleum Co., Inc. of Ohio v. Nixon*, 37 S.W.3d 237, 240 (Mo. banc 2001). Furthermore, the statute's "plain and ordinary meaning of the words themselves . . . are unrestricted, all-encompassing and exceedingly broad." *Id.* at 240.

104.   Zillow violated the MPA by omitting and/or concealing material facts about www.zillow.com and/or engaging in unfair or deceptive trade practices in its operation of www.zillow.com.   Notably, Zillow omitted and/or concealed that it directed Session Replay Providers to secretly monitor, collect, transmit, and discloses its website visitors' Website Communications to the Session Replay Providers using Session Replay Code.

105.   Zillow's direction and employment of the Session Replay Providers and their Session Replay Codes to intercept, collect, and disclose website visitors' Website Communications are material to the transactions on www.zillow.com. Zillow is leading online residential real estate marketplace in the United States and Zillow does not disclose its use of Session Replay Code to secretly monitor and collect website visitors' Website Communications. Had Plaintiff and the members of the Classes known that the Session Replay Codes (that collect, transmit, and disclose Website Communications to the Session Replay Providers) were embedded in Zillow's website, they would not have visited www.zillow.com to shop for, purchase, or contract to purchase real estate or they would have required Zillow to compensate them for the interception, collection, and disclosure of their Website Communications.

106.   Zillow intentionally concealed the interception, collection, and disclosure of

25

website visitors' Website Communications using Session Replay Code embedded in www.zillow.com is material because it knows that consumers would not otherwise visit its website to search for, purchase, and contract to purchase real estate. Indeed, Zillow's concealment of such facts was intended to mislead consumers.

107.    Zillow's concealment, suppression, and/or omission of material facts was likely to mislead reasonable consumers under the circumstances, and thus constitutes an unfair and deceptive trade practice in violation of the MPA.

108.    By failing to disclose and inform Plaintiff and the Classes about its interception, collection, and disclosure of website visitors' Website Communications, Zillow engaged in acts and practices that constitute unlawful practices in violation of Mo. Ann. Stat. §§ 407.010, *et seq.*

109.    As a direct and proximate result of these unfair and deceptive practices, Plaintiff and each member of the Classes has suffered actual harm in the form of money and/or property because the disclosure of their Website Communications has value as demonstrated by the collection and use of it by Zillow. The collection and use of this information has now diminished the value of such information to Plaintiff and the Classes.

110.    As such, Plaintiff and the Classes seek an order (1) requiring Zillow to cease the unfair practices described herein; (2) awarding actual damages; and (3) awarding reasonable attorneys' fees and costs. Plaintiff and the Classes seek all relief available under Mo. Ann. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by Mo. Code Regs. Ann. tit. 15, §§ 60-7.010, *et seq.*, Mo. Code Regs. Ann. tit. 15, §§ 60-8.010, *et seq.*, and Mo. Code Regs. Ann. tit. 15, §§ 60-9.010,

*et seq.*, and Mo. Ann. Stat. § 407.025, which provides for the relief sought in this count.

111.    Zillow's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and members of the Classes any time they visit Defendant's website with Session Replay Code enabled without their consent. Plaintiff and members of the Classes are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## COUNT III

### Invasion of Privacy – Intrusion Upon Seclusion

112.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

113.    Under Missouri law, the general tort of invasion of privacy describes four distinct torts under Missouri law: (1) unreasonable intrusion upon the seclusion of another; or (2) appropriation of the other's name or likeness; or (3) unreasonable publicity given to the other's private life; or (4) publicity that unreasonably places the other in a false light before the public. Plaintiff brings this claim individually and on behalf of the Classes.  Plaintiff states a claim for unreasonable intrusion upon the seclusion of another.

114.    Plaintiff and members of the Classes had an objective, reasonable expectation of privacy in their Website Communications.

115.    Plaintiff and members of the Classes did not consent to, authorize, or know about Zillow's intrusion at the time it occurred. Plaintiff and members of the Classes never agreed that Zillow could collect or disclose their Website Communications.

116.    Plaintiff and members of the Classes had an objective interest in precluding the dissemination and/or misuse of their information and communications and in conducting their personal activities without intrusion or interference, including the right to not have their personal information intercepted and utilized for business gain.

117.     Zillow intentionally intruded on Plaintiff's and Class and Subclass members' private life, seclusion, or solitude, without consent.

118.     Zillow's conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy.

119.     Plaintiff and members of the Classes were harmed by Zillow's wrongful conduct as Zillow's conduct has caused Plaintiff and the Classes mental anguish and suffering arising from their loss of privacy and confidentiality of their electronic communications.

120.     Zillow's conduct has needlessly harmed Plaintiff and the Classes by capturing intimately personal facts and data in the form of their Website Communications. This disclosure and loss of privacy and confidentiality has caused Plaintiff and the Classes to experience mental anguish, emotional distress, worry, fear, and other harms.

121.     Additionally, given the monetary value of individual personal information, Defendant deprived Plaintiff and members of the Classes of the economic value of their interactions with Defendant's website, without providing proper consideration for Plaintiff's and Class and Subclass members' property.

122.     Further, Zillow has improperly profited from its invasion of Plaintiff and Class and Subclass members' privacy in its use of their data for its economic value.

123.     As a direct and proximate result Zillow's conduct, Plaintiff and members of the Classes are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

124.     Zillow's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and members of the Classes any time they visit Defendant's website with session replay software enabled without their consent. Plaintiff and members of the Classes

are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## REQUEST FOR RELIEF

Plaintiff, individually and on behalf of the other members of the proposed Classes, respectfully requests that the Court enter judgment in Plaintiffs' and the Classes' favor and against Defendant as follows:

A.    Certifying the Class and appointing Plaintiff Jill Adams, herself, and Jill Adams in her capacity as Natural Mother and Next Friend of her minor child, H.A., as representatives of the Class;

B.    Certifying the Subclass and appointing Plaintiff Jill Adams in her capacity as Natural Mother and Next Friend of her minor child, H.A., as representative of the Subclass;

C.    Appointing Plaintiff's counsel as class counsel;

D.    Declaring that Defendant's past conduct was unlawful, as alleged herein;

E.    Declaring Defendant's ongoing conduct is unlawful, as alleged herein;

F.    Enjoining Defendant from continuing the unlawful practices described herein, and awarding such injunctive and other equitable relief as the Court deems just and proper;

G.    Awarding Plaintiff and the Classes statutory, actual, compensatory, consequential, punitive[30], and nominal damages, as well as restitution and/or disgorgement of profits

---

[30] Recent changes to the Missouri Merchandising Practices Act (MMPA) provide that:

A claim for punitive damages shall not be contained in the initial pleading and may only be filed as a written motion with permission of the court no later than 120 days prior to the final pretrial conference or trial date. The written motion for punitive damages must be supported by evidence. The

unlawfully obtained;

    H.      Awarding Plaintiff and the Classes pre-judgment and post-judgment interest;

    I.      Awarding Plaintiff and the Classes reasonable attorneys' fees, costs, and expenses;

and

    J.      Granting such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of herself and the Class, demands a trial by jury of any and all issues in this action so triable of right.

Dated: September 27, 2022             Respectfully submitted,

*/s/*     Tiffany Marko Yiatras
Tiffany Marko Yiatras, MOED Bar No. 58197MO
CONSUMER PROTECTION LEGAL, LLC
308 Hutchinson Road
Ellisville, Missouri 63011-2029
Tele: 314-541-0317
Email: tiffany@consumerprotectionlegal.com

Bryan L. Bleichner (MN #0326689), to seek
admission *pro hac vice*
**CHESTNUT CAMBRONNE PA**
100 Washington Avenue S, Suite 1700
Minneapolis, MN 55401
Telephone: (612) 339-7300
Fax: (612) 336-2940
bbleichner@chestnutcambronne.com

---

amount of punitive damages shall not be based on harm to nonparties. A pleading seeking a punitive damage award may be filed only after the court determines that the trier of fact could reasonably conclude that the standards for a punitive damage award, as provided in the act, have been met. The responsive pleading shall be limited to a response of the newly amended punitive damages claim.

Thus, Plaintiffs expressly disclaim punitive damages in this initial pleading; however, expect to file as a written motion with permission of the Court no later than 120 days prior to the final pretrial conference or trial date seeking punitive damages.

Kate M. Baxter-Kauf (MN #0392037), to seek
admission *pro hac vice*
Karen Hanson Riebel (MN #0219770), to seek
admission *pro hac vice*
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
kmbaxter-kauf@locklaw.com
khriebel@locklaw.com

*Attorneys for Plaintiff and the putative Class*

Query     Reports     Utilities     Help     Log Out

# U.S. District Court
## Eastern District of Missouri (St. Louis)
## CIVIL DOCKET FOR CASE #: 4:22-cv-01023-JAR

Adams et al v. Zillow Group, Inc.
Assigned to: District Judge John A. Ross
Demand: $5,000,000
Cause: 28:1332 Diversity-Breach of Contract

Date Filed: 09/27/2022
Jury Demand: Plaintiff
Nature of Suit: 195 Contract Product Liability
Jurisdiction: Diversity

**Plaintiff**

**Jill Adams**

represented by   **Tiffany M. Yiatras**
CONSUMER PROTECTION LEGAL
308 Hutchinson Road
Ellisville, MO 63011
314-541-0317
Fax: 855-710-7706
Email:
tiffany@consumerprotectionlegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jill Adams**
*as Natural Mother and Next Friend of her minor child, individually and on behalf of all others similarly situated*
next friend
H.A.

represented by   **Tiffany M. Yiatras**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Zillow Group, Inc.**

| Date Filed | # | Docket Text |
|---|---|---|
| 09/27/2022 | 1 | COMPLAINT against defendant Zillow Group, Inc. with receipt number AMOEDC-9527448, in the amount of $402 Jury Demand,, filed by Jill Adams(individually and on behalf of all others similarly situated), Jill Adams(as Natural Mother and Net Friend of her minor child, H.A., individually and on behalf of all others similarly situated). (Attachments: # 1 Civil Cover Sheet, # 2 Original Filing Form, # 3 Summons Zillow Group, Inc.)(Yiatras, Tiffany) (Entered: 09/27/2022) |
| 09/27/2022 | 2 | NOTICE OF PROCESS SERVER by Plaintiffs Jill Adams, Jill Adams (Yiatras, Tiffany) (Entered: 09/27/2022) |
| 09/27/2022 | | Case Opening Notification. Judge Assigned: Honorable Shirley P. Mensah. 1 Summons(es) |

|  |  | issued and emailed to Tiffany M. Yiatras. All parties must file the Notice Regarding Magistrate Judge Jurisdiction Form consenting to or opting out of the Magistrate Judge jurisdiction. Click here for the instructions. All non-governmental organizational parties (corporations, limited liability companies, limited liability partnerships) must file a Disclosure of Organizational Interests Certificate within 10 days of the filing of the first pleading or entry of appearance (moed-0001.pdf). (JBH) (Entered: 09/27/2022) |
|---|---|---|
| 09/27/2022 | 3 | AMENDED NOTICE OF PROCESS SERVER by Plaintiffs Jill Adams, Jill Adams Process Server: Northshore Process Legal Support Services, Inc. (Yiatras, Tiffany) Modified on 9/28/2022 (JEB). (Entered: 09/27/2022) |
| 09/27/2022 | 4 | Pursuant to Local Rule 2.08, the assigned/referred magistrate judge is designated and authorized by the court to exercise full authority in this assigned/referred action or matter under 28 U.S.C. Sec. 636 and 18 U.S.C Sec. 3401, including any case budgeting matters. (Potter, Jacob) (Entered: 09/27/2022) |
| 10/14/2022 | 5 | CJRA ORDER (GJL). Magistrate Judge Shirley Padmore Mensah termed. Case reassigned to District Judge Ronnie L. White for all further proceedings. (HMA) (Entered: 10/14/2022) |
| 10/17/2022 | 6 | Electronic Notice re: Disclosure of Organizational Interests Certificate to Defendant Zillow Group, Inc.. Pursuant to Local Rule 2.09, every non-governmental organizational party must file a Disclosure of Organizational Interests Certificate within ten (10) days of the party's first pleading or entry of appearance. Please complete and file the certificate as soon as possible (moed-0001.pdf). (Disclosure of Organizational Interests Certificate due by 10/27/2022.) (TMT) (Entered: 10/17/2022) |
| 10/17/2022 | 7 | ORDER: IT IS HEREBY ORDERED that this case is transmitted to the Clerk of the Court for random reassignment. Signed by District Judge Ronnie L. White on 10/17/2022. (TMT) (Entered: 10/17/2022) |
| 10/17/2022 | 8 | REASSIGNMENT ORDER (GJL). District Judge Ronnie L. White no longer assigned to case. Case reassigned to District Judge John A. Ross for all further proceedings. (TMT) (Entered: 10/17/2022) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 10/19/2022 10:44:51 | | | |
| **PACER Login:** | samanthasouthall | **Client Code:** | 0106198-000001-SS |
| **Description:** | Docket Report | **Search Criteria:** | 4:22-cv-01023-JAR |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |